58 N.J. Super. 145 (1959)
155 A.2d 781
EDGAR WEIL, PLAINTIFF-RESPONDENT,
v.
THE PENNSYLVANIA FIRE INSURANCE COMPANY, A CORPORATION, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 20, 1959.
Decided November 23, 1959.
*146 Before Judges PRICE, GAULKIN and FOLEY.
Mr. Samuel A. Gennet argued the cause for defendant-appellant.
No appearance for plaintiff-respondent.
*147 The opinion of the court was delivered by GAULKIN, J.A.D.
Plaintiff sued upon an insurance policy for the loss of his personal property, allegedly stolen from the locked trunk of his automobile. The district court judge, sitting without a jury, entered judgment in favor of the plaintiff and defendant appeals.
The evidence showed that plaintiff, a resident of Elizabeth, was in Baltimore on business on January 29, 1958. About 5 P.M. of that day he left his car in a parking garage. When he called for it on January 30 the keys were still in the garage office but the car was gone. After notifying the Baltimore police and calling his wife to report the theft to the agent who wrote the policy, he returned to Elizabeth by train, taking the keys with him.
On or about February 3 the car was found, damaged and abandoned, in Baltimore. Plaintiff claimed that his personal belongings had been taken from the trunk, and when his claim was not honored he instituted this action.
Appellant's first point is that the trial court should have entered judgment in its favor because "plaintiff's failure to file a proof of loss within 60 days after the occurrence bars the claim." For this proposition appellant relies on Brindley v. Firemen's Ins. Co., 35 N.J. Super. 1, 8 (App. Div. 1955).
To begin with, the policy is ambiguous. The form, captioned "Homeowners Policy," apparently was prepared, filed and approved pursuant to N.J.S.A. 17:36-5.21 and 5.22. Section 5.21 provides that "[e]very * * * policy of fire insurance may * * * include any other insurances which the insurer is authorized to make. * * *" Section 5.22 permits the insurance companies or its rating organizations to file "[a]ppropriate forms of contracts, or supplemental contracts, or extended coverage endorsements that will provide insurance in case of loss, damage or liability occasioned by any accident, incident, occurrence, or peril other than fire and lightning * * * for use with or as a part of such fire insurance policy * * *."
*148 The policy now before us has been put together by fastening ten assorted sheets to an eleventh which contains nothing but the 165 lines which N.J.S.A. 17:36-5.20 directs must appear in every fire insurance policy. The result is a collage which represents the triumph of mucilage over mind. Not only are the 11 sheets of varying sizes, but they are arranged in a bewildering fashion. For example, pages 2, 3, 4 and 5 are attached in reverse order. After some difficulty, we discovered that to make sense they must be read 5, 4, 3, 2. The remaining sheets are inserted without any apparent rhyme or reason. Page 1 of the policy contains the following:

 ------------------------------------------------------------------------
| | |
| | Coverages |
| | |
|-----|------------------------------------------------------------------|
| | | |
| | A. Dwelling | Subject to MPT 265(1/56) |
| *** | B. Appurtenant Private Structures | Form No. MPB 280(4/56) |
| | C. Personal Property on the Premises | |
| | D. Personal Property Away From the | and following Endorsement |
| | Premises | No.(s) attached hereto: |
| | E. Additional Living Expense | |
|-----|--------------------------------------| |
| | F. Comprehensive Personal Liability | MP 207a(3/56) |
| | (Bodily Injury and Property | |
| | Damage) | |
|-----|--------------------------------------| |
| | G. Medical Payments | |
 ------------------------------------------------------------------------

But this is followed by the statement, which appears in every fire insurance policy, that the insurance is only "against all direct loss by fire, lightning and by removal from premises endangered by the perils insured against in this policy, except as hereinafter provided * * *," while on at least one later page insurance is provided which is not included in any of the coverages on page 1. If the argument be made that the reference to the form numbers, quoted above, is intended to convey some meaning to the insured, the answer is that there are more forms attached than those listed.
At the top of page 5 there is discovered the following, in small print:
*149 "This entire contract is made subject to all the provisions and stipulations of the policy to which this form is attached, except as hereinafter modified."
This leaves it quite unclear as to how losses other than by fire are to be affected by those "provisions and stipulations." However, tucked away in equally small print at the bottom of page 5 this appears:
"Section 1 of this policy insures against all direct loss by the perils as defined hereunder. In the application of the provisions of the policy to which this form is attached, wherever the word `fire' appears, there shall be substituted the peril involved or the loss caused thereby, as the case requires."
In Brindley, supra, this court held that R.S. 17:36-6 was limited not only to the fire insurance policy but, even more narrowly, to losses by fire, and therefore failure to file proof of loss within the 60 days stated in lines 90-113 of the standard fire policy was fatal to a windstorm claim even though windstorm was covered (under a "supplemental coverage" endorsement) by the fire policy. An inspection of the briefs in Brindley shows that this construction of R.S. 17:36-6, advanced by the insurance company, was not disputed by the insured.
In a proper case it may become necessary to re-examine the holding in Brindley, supra. We shall not do so in this case, for it has not been briefed nor argued, and it is not essential to the disposition of this case, since we find that, even if the holding in Brindley is correct, the appellant here is estopped from raising the defense of late filing for the reasons hereafter set forth.
It would serve no useful purpose, and make this opinion far too long, if we were to go on to list all of the complexities and perplexities to be found in the 11 pages of this policy. Suffice it to say that they remind us of what the New Hampshire Supreme Court said in De Lancey v. Rockingham Farmers' Mutual Fire Ins. Co., 52 N.H. 581, 587 (Sup. Ct. 1873):
*150 "* * * policies like those used in this case, of a most complicated and elaborate structure were prepared, and filled with covenants, exceptions, stipulations, provisos, rules, regulations and conditions, rendering the policy void in a great number of contingencies. These provisions were of such bulk and character that they would not be understood by men in general, even if subjected to a careful and laborious study * * *.
As if it were feared that, notwithstanding these discouraging circumstances, some extremely eccentric person might attempt to examine and understand the meaning of the involved and intricate net in which he was to be entangled, it was printed in such small type, and in lines so long and so crowded that the perusal of it was made physically difficult, painful and injurious. Seldom has the art of typography been so successfully diverted from the diffusion of knowledge to the suppression of it. * * *"
In Precipio v. Insurance Co. of State of Pennsylvania, 103 N.J.L. 589, 592 (E. & A. 1927), the Court of Errors and Appeals, quoting with approval from Nelson v. Traders' Insurance Co., 181 N.Y. 472, 74 N.E. 421 (Ct. App. 1905), said:
"It was for the purpose of having contracts of insurance read clearly and intelligibly to the ordinary understanding of men that the legislature, in 1886, provided for a uniform, or standard, policy of insurance. Insurers issuing policies were compelled to use one form of contract, whose meaning should not be obscured by unusual clauses, nor concealed in a mass of verbiage, and whose provisions, being plain, could result in no injustice in their enforcement."
In 1944 (L. 1944, c. 171) and 1954 (L. 1954, c. 268) the 1886 standard fire insurance policy was comprehensively simplified and liberalized, to the great benefit of the public. The addition to that form of the mass of papers used here unnecessarily undoes that which was accomplished by that revision  unnecessary because our great insurance industry is certainly equal to the task of preparing a simpler "Homeowners Policy."
In the policy before us there are, on separate pages, three different provisions as to notice and two as to proofs of loss. True, each relates to a different coverage, but what clause relates to which coverage can be determined only *151 by a lawyer or an insurance expert, and perhaps even by them with difficulty.
The proof of loss clause which the insurance company insists applies here is that which is contained in lines 90 to 113 of the standard fire insurance policy which was, of course, designed for fire losses. Reading it in this policy, few laymen would suspect that it relates to a loss by theft.
Against this background of ambiguity and uncertainty, we find, as we have said, that what transpired here estops the insurance company from raising the defense of failure to file proof of loss as required by said lines 90-113. On January 30, the date on which the automobile disappeared, plaintiff notified the agent who had written the policy of the loss, by telephone, and was told "to wait until the car had been found * * *." The agent relayed the notice to the company, which assigned adjusters to investigate. Although the car was found in Baltimore, as we have noted, on or about February 3, it was not brought to New Jersey until some time later, and plaintiff did not see it until about February 15. Pursuant to the instructions received from the agent, plaintiff, on February 19, made a list of the allegedly lost personal property and its value and forwarded it to the agent. This list was sent by the agent to the company, which sent its adjuster to reinspect the automobile for "visible evidence of forcible entry." On March 18 plaintiff was interviewed by another of appellant's adjusters, at the Newark office of the General Adjustment Bureau, where a statement was taken from him, prepared by the adjuster and signed by plaintiff. During that interview plaintiff's letter of February 19 was in the possession of the adjuster, and "they discussed the items that were lost and the length of time that I had had them."
Shortly before June 23, 1958 appellant requested plaintiff to obtain a report from the Baltimore police. Plaintiff did so and forwarded it to appellant on June 23, 1958. Plaintiff testified that thereafter he "tried on many occasions to get a decision from them but * * * was unable to." Still *152 having heard nothing, the plaintiff, on July 21, telegraphed appellant. On July 22 appellant replied as follows:
"Your July 21 telegram, addressed to W.L. Nolen, United States Manager of the North British Group, has been referred to the undersigned for acknowledgement in connection with the loss reported under the above policy.
While we regret the delay in reaching a decision with respect to your claim, we do wish to assure you that we are pressing the investigation and expect to be in a position to advise you within a reasonable period of time as to whether or not we consider that your claim would come within the provisions of the policy."
During all of the foregoing negotiations, which commenced long before the deadline for the filing of the proof of loss and continued until long after, there was not the slightest suggestion to the plaintiff that proof of loss other than that which he had submitted was required. On the contrary, as we have seen, after the 60 days within which defendant now says the proof of loss should have been filed had expired, appellant asked plaintiff to obtain the police report, and assured him the claim was still under investigation on its merits. Under these circumstances, even if the policy were construed to require a proof of theft loss within 60 days, the company waived the requirement, and is now estopped from asserting it.
Appellant's second point is that "plaintiff was guilty of false swearing and is barred from recovery," (Standard Fire Policy lines 5-6, N.J.S.A. 17:36-5.20 (L. 1954, c. 268, s. 6); Public National Bank of New York v. Patriotic Ins. Co., 105 N.J.L. 477 (E. & A. 1929)). The alleged false swearing prior to the trial was not pleaded by appellant's answer and therefore it was properly rejected as a defense by the trial court. The false swearing which it is alleged took place at the trial would not avoid the policy. American Paint Service, Inc. v. Home Insurance Co. of New York, 246 F.2d 91 (3d Cir. 1957).
Appellant's final ground of appeal is based upon a clause in the policy which provides that it does not cover
*153 "* * * property left unattended in any private passenger motor vehicle on a public way or in a public garage or public parking lot, unless the loss be the result of forcible entry (of which there must be visible evidence) into a fully enclosed body or compartment (not including a glove compartment), the doors and windows of which have been locked."
Appellant contends that the evidence was not sufficient to prove that there was a "forcible entry (of which there [was] visible evidence)" into the trunk. We agree.
After the car was found in Baltimore, it was towed to a local repair shop where two wheels and tires, which had been stolen, were replaced, and new car keys made. The car was then driven to DeAngelis Cadillac, in New Brunswick, where the interior of the car was cleaned, and a voltage regulator and the rear bumper, which had been damaged, were replaced.
The only testimony offered by plaintiff to prove "visible evidence" of forcible entry was that of Ray DeAngelis, service manager of DeAngelis Cadillac. He said, on direct examination, that access could be gained to the trunk "through the interior * * * by removing the rear seat * * *"; but he was not asked, nor did he testify, whether or not in his opinion the trunk had been thus entered. However, DeAngelis did testify that "the main item [of damage] was the rear bumper, that was banged in * * *," and to cause that damage "you would have to give it a good jolt with something." Then:
"Q. Now, in your opinion if a blow, such as you described could have caused this damage, occurred to the rear face bumper bar, is it probable that the trunk lid would have opened?

* * * * * * * *
A. Yes, it is highly probable."
At no point did DeAngelis expressly say that in his expert judgment the trunk had been entered in one way rather than in the other. Without testimony, opinion or factual, that the trunk was entered by means of the blow on the bumper rather than through the interior (for which *154 the defendant would not be liable, because there was no proof of "visible evidence" of such entry) plaintiff was not entitled to recover (Professional Metals Mfg. Co. v. Maryland Cas. Co., 31 N.J. Super. 172, 175 (App. Div. 1954); Annotation, 169 A.L.R. 224.) "It is not enough to show that the plaintiff's loss may have been due to one or more causes for only one of which the insurer would be liable; he must individuate as the cause the one for which the insurer would be liable * * *." Brindley v. Firemen's Ins. Co. of Newark, supra.
Even if we accept DeAngelis' testimony as meaning that in his opinion the trunk was not entered from the interior but by means of a blow on the bumper, the hypothesis upon which he predicated that opinion does not square with the facts in evidence. Plaintiff had testified that the trunk was locked when the car was garaged. Indeed, if it had not been locked the policy would not have covered for, as we have seen, it covered theft only from a "fully enclosed * * * compartment * * * the doors * * * of which have been locked." DeAngelis testified, on cross-examination:
"Q. What would have caused the trunk to open? A. Well, the trunk locks, the way they are designed you can reach a certain tolerance where they will close and stay closed and not open and still not be latched; just like a door in a home, in damp weather they warp, they are closed but they are actually not, you can give them a shove and they will open without turning the latch, and many a time we have the same problem with the trunk lid on an automobile.
Q. Now, you checked this car; was there anything wrong with the lock on the trunk lid? A. Not that I can recall, no.
Q. Did you see any evidence at all, from your ten years' experience as a service manager, of any visible signs of forcible entry either into the trunk of this car or into the body of the car? A. Not that I can recall, no."
Since the hypothesis was not supported by the facts, the opinion based thereon should not have been accepted by the trial court as evidence of coverage. Stanley Co. of America v. Hercules Powder Co., 16 N.J. 295 (1954). Since *155 there was no other proof of a forcible entry of which there was visible evidence, it was error to enter judgment in favor of plaintiff. For this reason the judgment is reversed. No costs.