66 N.J. Super. 478 (1961)
169 A.2d 509
ELCAR MOBILE HOMES, INC., A CORPORATION OF THE STATE OF INDIANA, PLAINTIFF-RESPONDENT,
v.
D.K. BAXTER, INC., A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-THIRD PARTY PLAINTIFF-APPELLANT,
v.
HARTFORD ACCIDENT AND INDEMNITY COMPANY, A CORPORATION, THIRD PARTY-DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 5, 1960.
Decided March 30, 1961.
*479 Before Judges PRICE, GAULKIN and SULLIVAN.
Mr. Eugene Tighe, Jr. argued the cause for D.K. Baxter, Inc. (Messrs. Green & Tighe, attorneys).
Mr. James L. Cooper argued the cause for Hartford Accident & Indemnity Company, etc. (Messrs. Arkus & Cooper, attorneys).
No appearance for Elcar Mobile Homes, Inc.
*480 The opinion of the court was delivered by GAULKIN, J.A.D.
Elcar Mobile Homes, Inc. (Elcar) sued D.K. Baxter, Inc. (Baxter) in the Atlantic County District Court for damages allegedly caused to one of Elcar's house trailers while Baxter was removing paint from the surface of the trailer by sandblasting. Baxter filed a third-party complaint against Hartford Accident & Indemnity Company (Hartford) claiming that Hartford was obliged, under its policy issued to Baxter, to defend the action by Elcar and to pay any judgment Elcar might recover. Hartford denied liability. Hartford then served notice of motion for summary judgment "on the ground that there exists no genuine issue as to any material fact and that * * * Hartford * * * is entitled to the judgment as a matter of law. At the time of the hearing of said motion, Third Party Defendant shall rely upon the statement under oath of John Louis Crist * * *." The trial judge entered summary judgment in favor of Hartford, and Baxter appeals.
Neither the notice of motion for summary judgment nor the order granting summary judgment indicates upon what grounds the judgment was sought or granted. However, the parties agree that it was granted because the policy contains the following exclusion:
"This policy does not apply

* * * * * * * *
(j) under coverage D, to injury to or destruction of (1) property owned or occupied by or rented to the insured, or (2) except with respect to liability under sidetrack agreements covered by this policy, property used by the insured; or (3) except with respect to liability under such sidetrack agreements or the use of elevators or escalators at premises owned by, rented to or controlled by the named insured, property in the care, custody or control of the insured or property as to which the insured for any purpose is exercising physical control, or (4) any goods, products or containers thereof manufactured, sold, handled or distributed or premises alienated by the named insured, or work completed by or for the named insured, out of which the accident arises; * * *."
*481 The policy is a fearsome document of 11 pages, with varying sizes and styles of printing and typing. Hartford issued a certificate summarizing the coverage afforded by the policy as "Manufacturers' and Contractors' Bodily Injury Liability; Manufacturers' and Contractors' Property Damage Liability; Owners' or Contractors' Protective Bodily Injury Liability; Owners' or Contractors' Protective Property Damage Liability; Automobile Bodily Injury Liability; Automobile Property Damage Liability."
Although the United States Supreme Court was speaking of a different type of policy in Calmar Steamship Corporation v. Scott, 345 U.S. 427, 73 S.Ct. 739, 97 L.Ed. 1125 (1953), what it said there (345 U.S., at p. 432, 73 S.Ct., at p. ___, 97 L.Ed., at p. 1132) is apt here:
"Construing such conglomerate provisions requires a skill not unlike that called for in the decipherment of obscure palimpsest texts. * * * One envies not merely the perceptiveness of Lord Mansfield in matters of commercial law but his genial means of informing himself. We cannot resort to the elastic procedure by which Mansfield sought enlightenment at dinners with `knowing and considerable merchants,' nor have we any Elder Brethren of Trinity House to help us."
Cf. Ferrante v. Detroit Fire and Marine Insurance Co., 125 F. Supp. 621, 623 (S.D. Cal. 1954); Weil v. Pennsylvania Fire Ins. Co., 58 N.J. Super. 145 (App. Div. 1959).
Coverage D, to which the above quoted exclusion applies, is as follows:
"To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury or destruction of property, including the loss of use thereof, caused by accident."
The policy described Baxter's "Premises  Operations" as "Painting, Decorating or Paper Hanging N.O.C.  including shop operations. Painting ship hulls, steel structures or bridges to be separately rated. * * * Cleaning or *482 Renovating Outside Surfaces of Buildings. * * * Paint Mfg."
The "Statement Under Oath of John Louis Crist" mentioned in the notice of motion, and upon the basis of which the trial judge entered summary judgment, shows the following facts. Elcar was in the house trailer sales business. It had upon its lot a number of trailers, one of which had to be refinished to satisfy a purchaser. This required the removal of the old paint. Baxter was hired to do it by sandblasting. Crist was an executive of Baxter. He came to Elcar's premises with two men (Cole and a helper), where he was met by a representative of Elcar (Dietz), who pointed out the trailer that was to be sandblasted. The trailer was on wheels, but Crist said "it could be moved by their [Elcar's] equipment, not ours. Our equipment was too small."
The trailer had already been "masked," but more masking was needed. Crist sandblasted a 2'x2' section of the trailer as "a sample blast," which was approved by Dietz. Crist then told Cole "to go ahead, to finish masking and sandblast the trailer." Crist said he showed Cole "a sample of what I had done, and then I made him do part of the back in my presence before I left." After watching Cole for a while, Crist shut off the compressor, told Cole "This is the way I want you to continue to do the trailer," and departed.
The alleged damage was the "buckling" of the metal, which gave it a wavy appearance. Crist said:
"Q. Have you had experience of metal buckling before upon use of the sandblasting equipment? A. No, not too much in that respect * * * that is one reason I had actually made the first shot, the first section in Mr. Dietz's presence, and then also instructed my foreman to go ahead and sandblast a section for me. * * *"
Baxter sandblasted the front, back and sides of the trailer. The damage was discovered after the job was finished.
Since these were the only facts before the trial court upon the motion for summary judgment, Baxter contends that *483 the trial court erred in holding that the trailer was in the "care, custody or control" of Baxter, or that Baxter "was exercising physical control" over it, citing Boswell v. Travelers Indemnity Co., 38 N.J. Super. 599 (App. Div. 1956). Respondent, on the other hand, argues that the trial court was correct, citing Condenser Service & Engineering Co., Inc. v. American Mutual Liability Insurance Co., 58 N.J. Super. 179 (App. Div. 1959); Pompeii v. Phoenix Assurance Company of New York, 7 Misc.2d 846, 166 N.Y.S.2d 619 (Cty. Ct. 1957), affirmed 7 A.D.2d 806, 181 N.Y.S.2d 152 (App. Div. 1958), and the annotation in 64 A.L.R.2d 1242-1255 (1958).
When the "care, custody or control" portion of the exclusion was before this court in Boswell, we said, "Such words are inherently ambiguous * * *." In that case we held (38 N.J. Super., at pp. 605, 606, 607) that
"In such a case, the courts will take into consideration the apparent object or purpose of the insurance and, along with the context of the policy, the subject matter of the insurance, the situation of the parties, and the circumstances surrounding the making of the contract.

* * * * * * * *
Exclusion clauses are strictly construed against the insurer, especially if they are of uncertain import. An insurer may, of course, cut off liability under its policy with clear language, but it cannot do so with that dulled by ambiguity. As with the provisions of the policy as a whole, so also with the exceptions to the liability of the insure[r], the language must be construed so as to give the insured the protection which he reasonably had a right to expect; and to that end any doubts, ambiguities and uncertainties arising out of the language used in the policy must be resolved in his favor.

* * * * * * * *
Since insurance contracts are phrased by the insurer, it is for the insurer to make them so clear that they contain no ambiguity as to their meaning; otherwise they must be construed most strongly against the insurer."
In an article in the January 1959 Insurance Law Journal, page 7, entitled "Care, Custody or Control Exclusions," F.D. *484 Cooke, Jr., an insurance company superintendent of claims, tells us (page 9) that:
"There are several different reasons for such an exclusion in the policy. Fundamentally, were it not for the exclusion there would be a greater moral hazard as far as the insurance company is concerned. It also eliminates the possibility of the insured making the insurance company a guarantor of its workmanship.
The liability policy contemplates payment generally in situations where the ordinary degree of care is the measure of liability. The premium is determined on that basis. Liability for damage to property in charge of or in the care, custody or control of the insured where there is a bailment is controlled by different rules of law, and as a practical result the hazard is greatly increased." (Emphasis ours)
The reference to "greater moral hazard" appears to apply only to those sections of the exclusion clause which deal with "property owned or occupied by or rented to the insured, or * * * used by the insured"  i.e., property with reference to which the insured might benefit by falsely claiming that it had been damaged by "accident," or by exaggerating the loss. It is difficult to conceive how the question of moral hazard could arise with reference to property belonging solely and unconditionally to others.
We see also from Mr. Cook's explanation that the "care, custody or control" and the "exercising physical control" portions of the exclusion clause are intended to apply when there is a bailment; and about this there appears to be no dispute. Boswell, supra. But what if there is no bailment? Since, then, the "different rules of law," which Mr. Cooke correctly says control bailments, do not apply, but "the ordinary degree of care is the measure of liability," is that not the type of situation in which, as Mr. Cooke says, "the liability policy contemplates payment"? Note, also, that if one were to apply the principles of ejusdem generis to the exclusion clause, one would conclude that the general words "care, custody or control" and "exercising physical control" contemplated situations like "owned," "occupied," "used," or "rented to or controlled." However, we need not *485 pursue these questions further, for in the case at bar the element of "greater moral hazard" cannot be said to have existed, and there was no bailment.
The remaining alleged purpose (and the only one pertinent here) is to eliminate the "possibility of the insured making the insurance company a guarantor of its workmanship." It is quite reasonable for an insurance company to seek to avoid such liability. We should think that an accident policy such as the one before us does not guarantee workmanship, but if the insurance company thinks it needs to make that plain beyond dispute, it is a mystery to us why the insurer does not say so in simple language. It is not a concept difficult to express. See, for example, Berger Bros. Electric Motors v. New Amsterdam Cas. Co., 293 N.Y. 523, 58 N.E.2d 717, 718, 156 A.L.R. 1281 (Ct. App. 1944).
In Innis v. McDonald, 150 N.E.2d 441, at p. 444, (C.P. 1956), affirmed o.b. 150 N.E.2d 447 (Ct. App. 1956), the court said, and it is applicable here, that "It would seem that the argument might better have been advanced to the effect that the damage incident to the quality of the insured's workmanship, in the absence of some accidental means, would not constitute damages `caused by accident. * * *'" That question was not reached in the case at bar because, as we have said, the summary judgment was granted on the basis of the care, custody or control exclusion. Pursuant to our request, counsel briefed the question whether what happened here was an accident within the meaning of the policy. However, we find that the facts presented on the application for summary judgment are not sufficient to enable us to answer that question. It will have to be resolved by the trial court after a full exposition of all of the facts.
Minkov v. Reliance Insurance Co. of Philadelphia, 54 N.J. Super. 509 (App. Div. 1959), is not conclusive upon that question. In that case, the business of the insured was described in the policy as "Iron & Steel work," the operations as "Iron or Steel  work-shop, Iron or Steel erecting  dwelling not exceeding 2 stories." The policy insured against *486 accidents caused by hazards incidental to those operations. Those hazards were defined as follows (emphasis ours): "all operations * * * including pick-up and delivery, installation, servicing, removal or demonstration, and accidents (except accidents due to misdelivery) which occur after completion or abandonment of operations, * * *."
The contemplation that an "accident" might be due to "mis-delivery" (albeit, to be excluded) and the other language of the quoted clauses indicate the breadth of the term "accident" within the context of the Minkov policy. That breadth was confirmed by an endorsement which recited that eight paragraphs of the exclusions printed in the body of the policy were "deleted and the following substituted therefor":
"(1) Under Coverage B, with respect to Division 2 of the Definition of Hazards, to injury to or destruction of property arising out of the collapse of or structural injury to any building or structural injury to any building or structure due to excavation (including burrowing, filling or backfilling in connection therewith), tunneling, pile driving, cofferdam work or caisson work, or to moving, shoring, underpinning, raising or demolition of any building or structure, or removal of rebuilding of any structural support thereof; * * *."
Therefore, we held that what happened in the Minkov case was plainly an "accident" within the meaning of the policy there involved. We said that "to give the word `accident' the meaning for which defendant argues would manifestly defeat the purpose of the policy which is to protect against liability in circumstances like those here present," but even then we added (since the case had been dismissed when the plaintiff rested), "In any event, in assaying plaintiff's proofs, * * * it is evident that the proofs raised a factual issue [as to whether there had been an `accident'] and it follows that the trial court erred in granting defendant's motion."
Mr. Cooke complains in said article (p. 10) that "from the judicial interpretations it is difficult to formulate a *487 clear and concise rule by which to measure, with some degree of certainty, any factual situation in order to determine whether or not it might be held to come within the exclusion." The annotation in 62 A.L.R.2d, at p. 1244, agrees, for it says "Generally speaking, no rule of general application can be deduced from the cases."
Mr. Cooke continues, "Further, some decisions clearly indicate that the courts have not grasped the intent of the drafters of the policy or the reason why such an exclusion is desirable." The Boswell case is among those he criticizes. Nevertheless, he is frank to admit (at p. 10):
"I might say that the insurance companies themselves in the past have done a lot toward perpetuating the confusion.
You have heard the saying `everyone talks about the weather but nobody does anything about it.' For years the same applied to liability policies of casualty insurance. Although the companies complained about judicial interpretations of the wording affording coverage where no coverage was intended, no one ever changed the wording. * * *
The wording of a policy should not be cumbersome; nevertheless, it should be specific enough to express the intent. Other businesses are very quick to change the wording of contracts to better accomplish their purpose where judicial decisions have misconstrued the intent.
With the tendency today to saddle the insurance industry with more of the economic losses of society, there is no reason why insurance companies should be reluctant to change wording which is outmoded by court decision and new factual situations so that it no longer accomplishes the purpose of expressing the company's intent  even though it is necessary to spell it out in more detail and to change the wording more often."
The article points out that in 1955 there were added to the policy the words "property as to which the insured for any purpose is exercising physical control." In Boswell we said that the words "care, custody or control" were inherently ambiguous because "they are words of art which have been the focus of considerable judicial construction" in many fields of the law. Therefore, the addition of the quoted words is mere tautology, as ambiguous as that which it purports to supplement.
*488 The annotation in 62 A.L.R.2d, at p. 1244, remarks that "It is interesting to note that there is authority to the effect that the exclusion clause is inherently ambiguous and, on the other hand, that the clause is clear and unambiguous." That is merely because of the variations in the facts of the cases. The exclusion does plainly apply to the facts of certain cases. For example, if Elcar's trailer had been in Baxter's shop, while being sandblasted, the exclusion would, under the cases, clearly apply. See also International Derrick & Equipment Company v. Buxbaum, 240 F.2d 536 (3 Cir. 1957). Therefore, the words that were added in 1955 may make it easier to say that the exclusion covers a given factual situation, but the exclusion clause as a whole, when applied to facts such as we have here, is still as ambiguous as ever. For example, in Meiser v. Aetna Casualty and Surety Co., 8 Wis.2d 233, 98 N.W.2d 919 (Sup. Ct. 1959), the insured, a plasterer, scratched windows while removing splatterings of plaster. The insurer was held liable, in spite of an exclusion clause identical with the one at bar. The Wisconsin Supreme Court said, 98 N.W.2d, at p. 922, citing and following Boswell:
"The facts in the instant case show that appellant [insurer] was uncertain as to the application of the exclusion clause in the circumstances here. When respondent first reported the loss, appellant's agent was not familiar with the type of coverage provided by respondent's policy but thought the loss would be covered and advised respondent to file a claim. After discussing the matter with the appellant, the agent called respondent and told him he had coverage * * * [R]espondent discussed the claim with an investigator of the insurance company, a lawyer of several years standing, but it was not until a month later that appellant notified the respondent that the loss was excluded from coverage. These facts indicate that the appellant, as well as its agent, were not at any time sure of the construction which should be placed upon the exclusion clause and are entirely inconsistent with appellant's present contention that the phrase is unambiguous."
See also Haerens v. Commercial Casualty Insurance Co., 130 Cal. App.2d Supp. 892, 279 P.2d 211 (App. Dept. 1955). Cf. P. & M. Stone Co. v. Hartford Accident & *489 Indemnity Co., Iowa, 100 N.W.2d 28 (Sup. Ct. 1959), and Pompeii v. Phoenix Assurance Company of New York, supra.
In the Innis case, supra, the insured had contracted to paint a dwelling. He was required, among other things, "to scrape all loose and scaling paint." In the performance of his contract, he gouged the siding, door frames and window frames "by the use of various scraping tools and sanding machines," and burned other parts of the siding and frames with his blow torches. The insurer conceded this was an "accident" under the policy there involved. The court held that the "care, custody or control" exclusion did not apply to these facts, and that the insurer was liable. Since what the court said in Innis anticipated what we wish to say about the case at bar, we shall quote from the opinion at some length. The court said (at 150 N.E.2d 444-445):
"The essence of Buckeye's claim, therefore, is whether, under the terms of the policy, a distinction should be made between the `care, custody or control' of the dwelling house as an entity and the `care, custody or control' of that portion of the house on which the insured was to perform work, without regard to whether any damage was `caused by accident.' To accept the contention of Buckeye in its full scope would mean that the policy would not cover damages to any portion of the exterior of the dwelling house over which layers of paint ultimately were to be applied regardless of the extent of such damages or the manner in which such damages were sustained. Thus the accidental falling of a ladder damaging plaintiff's hedge would be covered, but the accidental falling of a ladder gouging the siding would not be covered.
Basically the claim of Buckeye appears to be that since the insured had the duty to exercise ordinary care as to the property on which he would perform services, such property was in his `control' or at least in his `care.' It should be noted, however, that the insured likewise had a duty to exercise ordinary care not to injure other property of the plaintiff, including the hedges, the automobile, the draperies, the interior of the house, etc. Buckeye concedes that damage to such other property would be covered by the policy, and yet if we are to apply to the word `care,' as used in the policy, the broad scope of the term as employed in the field of negligence law, the effect of such interpretation logically would be to exclude all liability coverage.

*490 * * * * * * * *
Even if we were to conclude that the portion of the dwelling house on which McDonald, by the terms of the contract, was to perform work, was in his `care, custody or control' at the specific moment that work was being performed thereon but that the policy would include liability for accidental injury to other portions of the dwelling house, we would still be faced with the problem of determining whether McDonald had `care, custody or control' of more than that portion of the surface of the siding, door frames and window frames which would be affected by his contractual agreement to `scrape all loose and scaling paint' and `to apply two coats of paint,' and whether the gouging and burning extended beyond such portion of plaintiff's dwelling house. While this might seem to be a hairline distinction, we are inclined to believe that the underlying theory of Buckeye's assertion would compel such determination. In view of what has been said before, however, we need not determine this issue. Instead we predicate our decision on the basis that in the ordinary usage of English grammar, we cannot say that the property of the plaintiff which was damaged, admittedly `caused by accident and arising out of the hazards hereinafter defined,' was property `in the care, custody or control of the insured.' In other words, we cannot say that the language under consideration clearly excludes the operation of the contract of insurance.

* * * * * * * *
At best the language employed when applied to the facts under consideration is capable of several constructions, some of which would include coverage and some of which exclude it.

* * * * * * * *
In our opinion the construction urged by the plaintiff is at least as reasonable, if not more reasonable, than that urged by Buckeye. If it be the intention of Buckeye, in policies of this type to exclude coverage for liability for damage, even though `caused by accident,' to property as to which the insured by the terms of his contract has a duty to perform some work, it would appear that the employment of precise unambiguous language could have accomplished this result."
Cf. Volf v. Ocean Accident and Guarantee Corp., 50 Cal.2d 373, 325 P.2d 987 (Sup. Ct. 1958); Hauenstein v. St. Paul Mercury Indemnity Co., 242 Minn. 354, 65 N.W.2d 122 (Sup. Ct. 1954).
It may be argued that the Boswell and Innis cases may be distinguished from the case at bar because they dealt with realty. See also Cooke, supra, at p. 10; 62 A.L.R.2d 1248-1251; but see the Condenser case, supra. We perceive *491 no basis in the policy or in reason for such a distinction. Would a 6'x6' metal tool shed attached to the realty not be within the care, custody or control of Baxter, while a railroad car, a tractor-trailer, or a steamship would be? We are of the opinion that what constitutes "care, custody or control" or "exercising physical control" depends not only upon whether the property is realty or personalty, but as well upon many other facts, such as the location, size, shape and other characteristics of the property, what the insured is doing to it and how, and the interest in and relation of the insured and others to it. Whether the property is realty or personalty, and the precise legal relationship of the insured and others to it, may be material in a given situation; but when they are, they are merely facts (more or less important, depending upon the circumstances) to be taken in conjunction with all other facts, in determining whether there is exclusion. So, in the Condenser case, the exclusion applied even though the property had become part of the realty. Conversely, even when dealing with realty, courts have held that the fact that the insured "controls" only a small part of a building does not necessarily defeat the application of the clause, where the insured damages the part which he does control. Hardware Mutual Casualty Co. v. Mason-Moore-Tracy, Inc., 194 F.2d 173 (2 Cir 1952); Sanco Co., Inc. v. Employees' Mutual Ins. Co. of Wis., 102 N.H. 253, 154 A.2d 454 (Sup. Ct. 1959). Cf. General Mutual Insurance Co. v. Wright, 7 Misc.2d 331, 161 N.Y.S.2d 974 (Sup. Ct. 1957).
Equally unmanageable as a guide for decision is the attempted distinction between property damaged which "is merely incidental to the property upon which the work is being performed by the insured," and property "which is a necessary element of the work involved." The distinction is easy to make verbally, but we conceive that, when it was applied to a given state of facts, the facts have governed, and not the verbalization. The alleged distinction rarely dictated the result; rather it justified it. The insured is *492 entitled to rely upon what he reads in the policy. He is not expected to know the fine distinctions between realty and personalty, or to understand the nuances of "care," "custody," "control," or similar terms. McAllister v. Century Indemnity Co., 24 N.J. Super. 289, 294 (App. Div. 1953), affirmed o.b. 12 N.J. 395 (1953); Gunther v. Metropolitan Casualty Ins. Co., 33 N.J. Super. 101, 109 (Cty. Ct. 1954). As we said in Boswell, "it must not be forgotten that the primary object of all insurance is to insure."
Applying these principles to the case at bar, we find that the facts presented in support of the application for summary judgment are not sufficient to establish that the house trailer was within Baxter's care, custody or control, or that Baxter was exercising physical control over it, within the scope of the exclusion. We find these facts more clearly akin to those in Boswell than to those in Condenser Service. Therefore, there should not have been summary judgment in favor of Hartford.
The judgment is reversed and the case remanded for a plenary trial of all issues, including that of "accident." Costs to abide the event.