**CHEMTEC MIDWEST SERVICES, INC.,**
**an Ohio corporation, Plaintiff,**

v.

**INSURANCE COMPANY OF NORTH AMERICA, a stock insurance company of Pennsylvania, Defendant.**

**No. 66–C–30.**

United States District Court
W. D. Wisconsin.
Jan. 29, 1968.

Charles J. Kersten and Kenan J. Kersten, Milwaukee, Wis., for plaintiff.

Frank L. Morrow and James E. Garvey, Eau Claire, Wis., for defendant.

JAMES E. DOYLE, District Judge.

Plaintiff (hereinafter Chemtec Midwest) is a corporation incorporated by the state of Ohio, which has its principal place of business in the state of Indiana, and defendant (hereinafter INA) is a stock insurance company organized under the laws of the state of Pennsylvania. The amount in controversy is in excess of the sum of $10,000, exclusive of interest and costs. The action is for declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring the rights and legal relations as between the parties, with respect to the coverage of a certain general liability insurance policy issued to Chemtec Midwest by INA. This court enjoys jurisdiction pursuant to 28 U.S.C. § 1332 (a). There is an actual controversy between the parties and the action is ap-

propriate for declaratory judgment under 28 U.S.C. § 2201.

To Chemtec Midwest's contention that the policy covers a certain situation more fully described hereinafter, INA has responded: (1) that the situation falls within a policy exclusion referred to as the "care, custody or control exclusion"; and (2) that the word "accident", as used in the policy, saves INA from any obligation to Chemtec Midwest in the situation here present (hereinafter referred to as the "no-accident" defense).

Trial of the issues related to the "care, custody or control" defense was had to the court, by agreement of the parties. The court ordered that evidence received at the trial which may be relevant to both defenses would be received only in relation to the "care, custody or control" defense.

Rulings on a number of evidentiary issues were reserved at trial. To the extent that decisions with respect to them have proved necessary to a determination of the "care, custody or control" issue, said evidentiary rulings will be noted at appropriate points hereinafter.

Upon the basis of the entire record herein, I make the findings of fact and reach the conclusions of law set forth hereinafter.

On or about March 31, 1963, INA issued a one-year term "comprehensive general liability policy", CGL 20 29 93, in which Chemtec Services, Inc., the parent company of Chemtec Midwest, was stated to be the named insured. Endorsement No. 1, also effective March 31,* 1963, provided that "the name of the insured is indicated to read as follows: Chemtec Services, Inc. [the parent company], Chemtec Midwest Services, Inc. [plaintiff herein], Dix Chemical Services, Inc., Coast Tank Services, Inc., McCormicks Chemical and Inspection Co., Inc., Chemtec Pacific Services, Inc., Chemtec Eastern Services, Inc., Walker Chemtec Serv-

ices, Inc." The "Business of the Named Insured" is shown as "chemical cleaning of boilers and blast furnaces."

By the terms of said policy INA agreed to pay on behalf of Chemtec Midwest (and the other named insureds) "all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident." The exclusions section of the policy provides that it does not apply: "to injury to or destruction of * * (2) except with respect to liability under sidetrack agreements covered by this policy, property used by the insured, or (3) except with respect to liability under such sidetrack agreements or the use of elevators or escalators at premises owned by, rented to or controlled by the named insured, property in the care, custody or control of the insured or property as to which the insured for any purpose is exercising physical control. * * *"

I find that the possible liability of Chemtec Midwest for damage to property involved in this action and in the related action of Sterling Pulp & Paper Co. v. Chemtec Midwest Services, Inc., C–64–72, is not "liability under sidetrack agreements covered by this policy", and is not "liability under * * * the use of elevators or escalators at premises owned by, rented to or controlled by the named insured. * * *" Therefore, the relevant language of the exclusion is: "property in the care, custody or control of the insured or property as to which the insured for any purpose is exercising physical control. * * *"

On July 30, 1964, there was commenced in the Circuit Court for Eau Claire County, Wisconsin, an action by Sterling Pulp & Paper Company (hereinafter Sterling), a Wisconsin corporation which operates a plant in the City of Eau Claire, Wisconsin, against Chemtec Midwest. Chemtec Midwest removed said action to this court and it is pending here as case number

---

* It appears that the policy proper was originally typed to commence March 16, that "16" was erased and "31" inserted, but that the date was not altered on the endorsement. I find no significance in this and treat the endorsement as if it read "31".

C–64–72. The complaint in said action by Sterling alleges that in May, 1963, Chemtec Midwest made an offer to clean chemically two large boilers owned and operated by Sterling at its plant; that Chemtec Midwest made certain warranties; that in September, 1963, Sterling accepted the offer in reliance on the warranties; "[t]hat on or about the 29th day of September, 1963, [Chemtec Midwest] did through its employees and agents enter upon the property of the plaintiff in pursuance to said contract and did proceed to chemically clean said boilers in accordance with its own methods and using its own chemicals and materials"; that except for the need of cleaning, the boilers were in good condition; that Sterling performed its obligations under the contract "including the turning over to it [Chemtec Midwest] of the boilers in question in sound and satisfactory condition and the furnishing of commercial grade soda ash for the use of [Chemtec Midwest] as required by said contract"; that "shortly after the commencement of the services of [Chemtec Midwest] it was discovered by [Sterling] that the materials and methods used by [Chemtec Midwest] were causing serious damage to the tubes, drums, plates and other parts of said boilers by reason of acid corrosion destroying the surface and structural integrity of said parts"; that Sterling immediately by phone notified Chemtec Midwest of the damage, and later gave written notice, and later gave notice of the extent of the damage and made demand for payment; and that Sterling was in fact damaged in the total amount of $123,035.53 by reason of Chemtec Midwest's failure properly to discharge the services represented and warranted in the contract. In a separate count, Sterling alleged the same damages to have resulted from Chemtec Midwest's negligent use of improper acid and materials, negligent failure to use proper chemicals and methods to counteract the action of said acid, negligent failure to use an adequate inhibitor for the acid concentration used, negligence with respect to the temperatures under which the cleaning operation was conducted, and negligent failure to observe the usual custom and practice and required procedures for the cleaning operation.

Chemtec Midwest has filed an answer in C–64–72. The answer generally denies the giving of the alleged warranties; "admits that [Chemtec Midwest] entered upon the property of [Sterling] to perform such services, and proceeded to chemically clean such boilers"; alleges that the chemicals and materials used were procured from third parties; alleges that Chemtec Midwest used standard methods and processes; denies knowledge of the condition of the boilers and therefore "denies that said boilers were turned over to [Chemtec Midwest] in a sound and satisfactory condition"; denies knowledge whether the material furnished to Chemtec Midwest by Sterling was commercial grade soda ash; denies that the materials and methods used by Chemtec Midwest were discovered by Sterling to be causing damage to the boilers; denies that any act of Chemtec Midwest caused damage to the boilers and resulting financial damage to Sterling; denies that Sterling duly notified it of any alleged breach of warranty or resulting damages; denies any negligence on the part of Chemtec Midwest and denies that any damage resulted from any negligence on its part. As an affirmative defense, Chemtec Midwest alleges that "at the time said boilers were turned over to it for such services", the boilers and connected equipment were in an unsound and defective condition; that Chemtec Midwest had no way of knowing of such condition at the time; and that any damage which may have occurred was the result of Sterling's own acts and omissions.

Considerable evidence was offered at the trial herein, both in the form of testimony and exhibits, with respect to the activities of Chemtec Midwest and INA, in relation to one another, subsequent to September 29, 1963, the date on which the cleaning of the Sterling boilers occurred. A blanket and continuing objection was made to all such offered evidence on the ground that it is irrelevant to the issues in this case. The testimony

was heard and the exhibits submitted, subject to the objection, and a ruling on the objection was reserved. More particular objection was made to testimony and exhibits relating to the period subsequent to a so-called "reservation of rights" by INA in February, 1964. Both the broader and the narrower objections are hereby overruled. I conclude that the testimony and exhibits are relevant to two issues. One is the issue whether the exclusionary language is ambiguous; evidence of uncertainty and hesitation on the part of the insurer, subsequent to the disputed occurrence, is relevant. The second is the issue of the intent of the parties at the time the policy was issued; a course of conduct over a period of time may form a pattern from which inferences reasonably may be drawn about a party's state of mind early in the period. All testimony and exhibits to which such objection was made are hereby received. Specifically, but not to the exclusion of other evidence received by virtue of this ruling, Chemtec Midwest's exhibits 8, 10, 11, 14, 15, 16, 17, 18, 19, and 22, and Sterling's exhibits 2, 3, and 6 are hereby received.

If not by any earlier notice, INA was notified of Sterling's claim against Chemtec Midwest by a letter from Sterling to INA, dated October 8, 1963. INA promptly communicated with Chemtec Midwest about the facts underlying the claim, and in October INA retained Mr. Frank Morrow, a lawyer practicing in Eau Claire; I make no finding whether INA retained Mr. Morrow as an investigator and not as an attorney, or as its attorney to represent it in relation to Sterling's claim, or as its attorney to represent it and Chemtec Midwest in relation to Sterling's claim, but I find that he was retained at least as an investigator. Apparently at the request of Chemtec Midwest, INA furnished to Sterling on October 10, 1963, a certificate that it had issued to Chemtec Midwest the policy here in question, and under a typed heading "Evidence of Coverage" showed the type of policy, policy number and period, and monetary limits of liability. There

is no written evidence that anyone within INA raised a question with respect to any policy defense based on an exclusionary clause prior to January 24, 1964.

By letter of February 14, 1964, about four months after it first became aware of the September 29, 1963, incident, INA notified Chemtec Midwest (the letter is addressed to Chemtec Services, Inc., Box 398, Shererville, Indiana, which was the office of Chemtec Midwest) that INA would continue its investigation:

" * * * under a Reservation of Rights with respect to a possible lack of coverage under our policy for any damage caused by your employees and equipment, while exercising physical control over the boilers involved. As you no doubt know, your policy contains a standard care, custody and control exclusion and as your employees were exercising physical control over these boilers at the time the alleged damage was done, it is entirely possible that the insuring provisions of our policy would not apply in this situation. In the event suit papers are served on your company by the claimant in this matter, please be sure to submit them to the undersigned immediately upon receipt."

By letter dated August 21, 1964, Chemtec Midwest's parent company notified INA that Sterling had commenced suit and requested that INA take over the defense. In a letter to counsel for Chemtec Midwest dated August 31, 1964, INA's claims manager stated, in pertinent part: " * * * I have now been advised that it is our position that the occurrence that is the basis for this action grew out of and is the direct result of circumstances not covered by our policy CGL 202993 and therefore we must decline to take any action in this matter in behalf of Chemtec Midwest Services, Inc." INA has in fact refrained ever since from participating in the defense of Sterling's action against Chemtec Midwest, C-64-72, and the said action is presently in abeyance, awaiting a judicial declaration in this action, 66-C-30, with respect to the policy coverage.

■ In choosing the state whose law is to be applied for purposes of determining whether a contract is sufficiently ambiguous to require judicial construction and, if so, what that judicial construction should be, I am bound in this diversity action to apply Wisconsin's choice-of-law rule. Klaxon Co. v. Stentor Mfg. Co., Inc., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In Estate of Knippel, 7 Wis.2d 335, 342, 96 N.W.2d 514, 517 (1959), it was said: " * * * the choice of law governing validity and interpretation [of contracts] is basically a question of the intention of the parties except where their intention is to commit a fraud on the law. In the absence of evidence to the contrary, the law of the place of making the contract is presumed to be intended unless the place of performance be different. In the latter instance there is a rebuttable presumption that the law of the place of performance controls. * * * These presumptions do not answer the question presented in this case with complete certainty because" the contract was made in Arizona but was to be performed both in Arizona and Wisconsin. Both in Knippel, at 343, 96 N.W.2d 514, and in Peterson v. Warren, 31 Wis.2d 547, 556, 143 N.W.2d 560 (1966), the Supreme Court of Wisconsin has observed that these traditional rules dependent upon place of making, place of performance, and presumed intention of the parties, have "fallen into disfavor, yielding to the 'grouping of contacts' or 'center of gravity' theory," 31 Wis.2d, at 556, 143 N.W.2d, at 563. The Supreme Court of Wisconsin appears not to have found it necessary as yet to declare whether it honors the traditional rules or the "grouping of contacts" theory. However, for the reasons to be stated immediately hereafter, I conclude that both the traditional rules and the "grouping of contacts" theory require the same choice of law in the present case.

With respect to those portions of the insurance policy relevant to the present action, the March 31, 1963, policy was a renewal of a policy which had arisen out of extended negotiations by R. K. Hughes, Inc., an insurance agency in Nutley, N. J., acting for INA, on the one hand, and H. Wellman Tuxbury, acting initially as an officer of and on behalf of Kemkote Service Company, a New Jersey corporation, and then as an officer of and on behalf of Chemtec Services, Inc., also a New Jersey corporation, and Curt Gamlen, acting as an officer of and on behalf of Chemtec Services, Inc., on the other hand. Chemtec Services, Inc., was organized for the purpose of acquiring controlling interests in several chemical cleaning businesses throughout the United States, and it did proceed with such acquisitions throughout the United States, including Kemkote and Chemtec Midwest, the plaintiff in the present action. Kemkote had had a public liability policy (in which the "care, custody or control" exclusion appeared), issued by INA on April 19, 1961, for one year and in about August, 1961, when Chemtec Services, Inc. was incorporated, Chemtec Services, Inc. was substituted as the named insured on the policy. A one-year renewal policy was issued to Chemtec Services, Inc., by INA, apparently in March, 1962, and Chemtec Midwest was "bound" or covered by it as an insured in late March, 1962. There was no difference, relevant to the present controversy, between the 1962–1963 policy and the 1963–1964 policy.

A major discussion of the liability insurance coverage between George Delaney, a representative of R. K. Hughes, Inc., and Mr. Tuxbury occurred in August, 1961, and another such major discussion among Mr. Delaney, Mr. Tuxbury, and Mr. Gamlen occurred in March, 1962. All of these discussions occurred in New Jersey. Each of the policies was issued in New Jersey. Premium payments were paid to R. K. Hughes, Inc., in New Jersey. For a time they were paid by Chemtec Services, Inc. from its New Jersey office; later R. K. Hughes, Inc. was requested to, and did, bill each of Chemtec's subsidiaries, including Chemtec Midwest, directly for their proportional shares of the total premium; it is not clear whether this change in

procedure occurred before or after payment of the premium on the 1963–1964 policy. The endorsement to the 1963–1964 policy includes as named insureds seven subsidiaries of Chemtec Services, Inc. (of which Chemtec Midwest was one), and shows as the locations of these subsidiaries: Ohio, Indiana, New Jersey, Pennsylvania, Colorado, California, and Massachusetts.

In this record there is an absence of evidence of any conscious intention of the parties that the law of New Jersey should govern their contract, or that the law of some other state should govern, or that the laws of several states should govern. Under the traditional rules, presumptions must be resorted to. Because the contract was to be performed in many states, in the sense that the activities of the insureds covered by the policy were expected to occur in many states, I conclude that it is unreasonable to presume an intention that the laws of any one, or all, of the many places of performance were to govern. Thus, under the traditional rules, we are left with a presumption that the laws of New Jersey, the place of the making of the contract, were intended by the parties as the governing laws.

In the application of the "grouping of contacts" theory, all of the foregoing considerations are pertinent. In addition, however, it may be relevant to consider the actual experience during the time period in which the policy was in force. Chemtec Midwest was organized in 1962. During the year 1963 it did about as much business in Wisconsin as in Illinois, less business in Wisconsin than in Ohio, more in Wisconsin than in North Dakota, Indiana, Minnesota, Michigan, Kentucky, Missouri, West Virginia, and New York. Thus, even viewing the policy as limited to a contract between INA and Chemtec Midwest, the contacts with Wisconsin are not so numerous or distinctive or significant as to require selection of Wisconsin as a "center of gravity". But it is not fair, in any event, to view the policy other than as a contract with the parent company and

its seven subsidiaries. The overall operations of Chemtec Services, Inc., and all of its subsidiaries, for the year ending March 31, 1964, extended to about 30 states, and those in Wisconsin represented about 2% to 3% of the total. I conclude that the application of the "grouping of contacts" theory also results in New Jersey as the state the laws of which must be chosen for application to this contract.

The initial inquiry is whether the relevant exclusionary language of the policy is sufficiently ambiguous to require judicial construction. As stated above, that relevant language is: " * * * property in the care, custody or control of the insured or property as to which the insured for any purpose is exercising physical control. * * * " On their face, the words are probably neither more nor less ambiguous than many other terms of insurance policies, whether liability insurance or other kinds. As applied to the "chemical cleaning of boilers and blast furnaces", which was the business of the named insureds as it was described on the face of the policy, the ambiguity of the language is heightened. That the language is ambiguous is further indicated in INA's conduct during the four months following the disputed occurrence; it is not reasonable to conclude, as the insurer contends, that its failure to assert its "reservation of rights" within a shorter period resulted wholly from its inability to assemble the basic facts more quickly. It would be more accurate, and it would be fair to INA, to say that coverage or non-coverage in such a situation might turn ultimately upon an evaluation of a mixture of factors reflecting the nature and extent of the relative participation of Sterling and Chemtec Midwest in the cleaning operation. This is another way of saying that the standard to be applied to the situation—that is, the standard embodied in the language of the policy—is ambiguous. Even in its February 14, 1964, reservation of rights letter, INA was content to state that "it is entirely possible" that the exclusion was appli-

cable. Presumably, INA would have continued its investigation and analysis of the coverage question thereafter, but it was not until August 31, some ten months after notice to it of the occurrence, that INA unequivocally asserted that the policy exclusion was applicable.

If there remains any doubt that the exclusionary language is ambiguous, the doubt is resolved by the authority of Elcar Mobile Homes, Inc. v. D. K. Baxter, Inc., 66 N.J.Super. 478, 169 A.2d 509 (App.Div., 1961), in which the very language here involved was held to be ambiguous. See also Boswell v. Travelers Indemnity Company, 38 N.J.Super. 599, 120 A.2d 250 (App.Div., 1956).

█ I conclude that the relevant exclusionary language of the INA policy is ambiguous and that it requires judicial construction.

The proper construction of the ambiguous policy language must be ascertained in the factual context in which the contract was made. The 1961–1963 history of the policy has been described above in the course of developing the facts relevant to a choice of law, and particular reference has been made to an August, 1961, conference between Mr. Delaney, for INA, and Mr. Tuxbury, for Chemtec Services, Inc., and to a March, 1962, conference among Mr. Delaney, for INA, and Mr. Tuxbury and Mr. Gamlen, for Chemtec Services, Inc. It appears that there were other conversations between Mr. Delaney and Mr. Tuxbury. There is sharp and direct conflict between Mr. Delaney's account of these conferences and related negotiations, and the accounts of Mr. Tuxbury and Mr. Gamlen; among other things, Mr. Delaney denies that Mr. Gamlen ever participated in any discussion with him concerning the coverage aspects of the policy.

There is no dispute, and I find, that both sides intended that the policy cover generally the nationwide operations of the parent company and its subsidiaries, including Chemtec Midwest, and that it was intended to protect Chemtec Midwest for property damage arising out of its business operations, and that its central and major business operation was the chemical cleaning of boilers. I also find that Mr. Tuxbury and Mr. Gamlen anticipated that, with few exceptions, the subsidiaries, including Chemtec Midwest, would be performing this chemical cleaning operation on boilers which would be physically fixed in the industrial plants of the customers, and that this anticipation was confirmed by the actual experience which followed. It is not reasonable to believe that they intended to obtain public liability insurance which would leave their companies unprotected in the mainstream of their operations. Mr. Delaney's testimony is to the effect that he expressly explained that the "care, custody, or control" exclusion would deny coverage in situations in which Chemtec personnel would be alone in tanks being cleaned at a refinery tank farm, and explained that INA would not write a policy without the exclusion but that Chemtec could get such a policy from Lloyd's at an annual premium of about $10,000; but that Chemtec chose not to incur the added expense. Mr. Tuxbury and Mr. Gamlen, on the other hand, have testified to the effect that Mr. Delaney said that the "care, custody or control" exclusion would apply to situations such as the following: a situation in which a tank was physically removed from a customer's plant and taken to Chemtec's place of business to be cleaned; or perhaps a situation in which the customers' tanks to be cleaned were located on premises geographically and physically isolated and unmanned by customers' personnel, such as certain refinery tank farms in remote locations, at which the Chemtec personnel would be in exclusive "physical control" of the equipment. Since such situations were anticipated to be infrequent and the cost of insurance coverage was substantial, Mr. Tuxbury and Mr. Gamlen testify, Chemtec was willing to accept the exclusion in the policy.

Understandably, the testimony of each of these three witnesses is marked by occasional apparent inconsistencies. Thus, from Mr. Delaney's testimony it is

unclear whether his discussions with the Chemtec representatives reached the subject of boilers specifically, as contrasted with tanks, such as refinery tanks and ship tanks (Delaney deposition, p. 61, lines 18–23); at one point Mr. Delaney seems to say that he explained that the "care, custody or control" exclusion would be operative when Chemtec "men were alone in that tank" (Delaney deposition, p. 9, line 16).

In Boswell v. Travelers Indemnity Company, 38 N.J.Super. 599, 120 A.2d 250 (1956), dealing with a similar situation, the Superior Court of New Jersey, Appellate Division, emphasized that to give to an exclusion clause the construction urged for it by the insurer would strip the insured of protection against risks incurred in the normal operation of his business, despite the insurer's awareness of the nature of these normal operations at the time the policy was issued. It said (38 N.J.Super., at 610, 120 A.2d, at 255): "Such an unreasonable and nugatory result should not be allowed by the court if the ambiguities of the language permit of judicial construction."

■■■ In language later quoted approvingly in Elcar, 66 N.J.Super., at 483, 169 A.2d, at 511–512, the Superior Court in Boswell said (38 N.J.Super., at 605, 606, 607, 120 A.2d, at 253):

"In such a case, the courts will take into consideration the apparent object or purpose of the insurance and, along with the context of the policy, the subject matter of the insurance, the situation of the parties, and the circumstances surrounding the making of the contract. * * * Exclusion clauses are strictly construed against the insurer, especially if they are of uncertain import. An insurer may, of course, cut off liability under its policy with a clear language, but it cannot do so with that dulled by ambiguity. As with the provisions of the policy as a whole, so also with the exceptions to the liability of the insure[r], the language must be construed so as to give the insured the protection which he reasonably had a right to expect; and to that end any doubts, ambiguities and uncertainties arising out of the language used in the policy must be resolved in his favor. * * * Since insurance contracts are phrased by the insurer, it is for the insurer to make them so clear that they contain no ambiguity as to their meaning; otherwise they must be construed most strongly against the insurer."

In Elcar, the court concluded that the insurer apparently had intended by the "care, custody or control" exclusion to exclude bailments because a higher standard of care is required of a bailee; that it may have intended to exclude other situations in which something more than the ordinary degree of care would be required; and that it may have desired to avoid making itself the guarantor of its insured's workmanship. It found no bailment in the case, and no operative standard of care higher than an ordinary degree of care. It said that if the insurer intended to avoid guaranteeing its insured's workmanship, it could have said so "in simple language". 66 N.J. Super., at 484–485, 169 A.2d, at 512.

■■ I conclude that the "care, custody, or control" exclusion was not intended to apply to the normal situation in Chemtec Midwest's operations, when its personnel would go into a customer's plant and chemically clean boilers permanently in place at said plant, in the absence of circumstances in which Chemtec's "physical control" would be unusually and extraordinarily marked and complete, such as in a bailment. It is essential to a bailment that there be at least constructive "delivery" of the chattel to the bailee; that is, a transfer of "such a possession of the property as will exclude for the time of bailment the possession of the owner." 8 Am.Jur.2d, Bailments, §§ 2, 54–56.

With respect to the situation at the Sterling plant on September 29, 1963, I find that:

On September 29, 1963, the boilers in question were permanently affixed to the Sterling premises and were a

functional part of the power and heating system of the Sterling plant, and at no time on said day did the agents or employees of Chemtec Midwest move, alter or repair said boilers or their parts.

On September 29, 1963, the participation of the agents of Chemtec Midwest in chemically cleaning the boilers in question was limited to testing the temperature of the boilers, attaching the acid hose to the boilers, pumping the acid solution from the truck outside the building into the boilers and periodic testing, outside the boilers, of samples of the acid solution taken from the boilers during the soaking phase of the cleaning process.

On September 29, 1963, Sterling's maintenance engineer and some members of his crew of 5 to 8 men were present during the entire cleaning operation and their participation in the chemical cleaning of the boilers in question included preparing the boilers for cleaning by draining hot water therefrom and feeding in cool water, disconnecting the line into which the acid solution was to be pumped, draining the water from the boilers to accommodate the introduction of the acid solution, draining the acid solution from the boilers after the soaking periods, performing the two rinses between the soaking phase and the neutralization phase of the cleaning process, mixing the soda ash solution from soda ash supplied by Sterling, conducting the neutralization phase of the cleaning process by putting the soda ash solution into the boilers and boiling the solution for two to three hours, draining the soda ash solution from the boilers, performing the final flushing out of the boilers and filling them with water to put them back on the line.

During the chemical cleaning process on September 29, 1963, the boilers in question remained under the general supervision of Mr. Robert Kirby, the Sterling maintenance engineer.

There was nothing about the situation at Sterling on September 29, 1963, which represented a significant departure from Chemtec Midwest's normal operations, with respect to the degree of control it exercised over the customer's boilers. There was no bailment.

 I conclude, declare and adjudge that on September 29, 1963, the Sterling boilers in question were not, within the meaning of the INA policy, "property in the care, custody or control of [Chemtec Midwest] or property as to which [Chemtec Midwest] for any purpose [was] exercising physical control."

Nothing in this opinion and partial judgment is to be construed as reaching the so-called "no-accident" defense raised by INA.