38 N.J. Super. 599 (1956)
120 A.2d 250
ROBERT J. BOSWELL, D/B/A NEW JERSEY BOILER REPAIR COMPANY, RESPONDENT,
v.
THE TRAVELERS INDEMNITY COMPANY, A CORPORATION, APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued December 19, 1955.
Decided February 3, 1956.
*602 Before Judges CLAPP, GOLDMANN and FRANCIS.
Mr. John J. Monigan, Jr., argued the cause for appellant (Messrs. Stryker, Tams & Horner, attorneys).
Mr. Harold D. Feuerstein argued the cause for respondent.
The opinion of the court was delivered by GOLDMANN, J.A.D.
Plaintiff recovered judgment in the Law Division against defendant in an action seeking reimbursement under a Travelers policy for liability incurred by plaintiff in the course of certain boiler repairs. Defendant appeals, claiming that the exclusion clause of its policy applied to the asserted claim.
The facts are not in dispute. Plaintiff is in the business of installing and repairing steam boilers. Defendant issued its "Manufacturers' and Contractors' Liability Policy" covering plaintiff, insofar as it is relative here, for injury to or destruction of property caused by accident and arising out of the hazards defined in the policy (Coverage B). The policy was in effect at the time of the accident about to be described.
In June 1953 plaintiff entered into a written agreement with W.R. Realty Corp. to replace all of the tubes in two heat exchange units located at the latter's office building in New York City. The units, each weighing ten tons, were connected to the boiler in the basement. Plaintiff undertook to clean and scale the inside of the unit shells and heads, to see that the pipelines to the units were "solid" and, after *603 the new tubes were installed and tested, to close the units and put them on the line ready for operation. The Realty Company had its maintenance engineer, Petroff, who was in charge of the boiler room and building, erect scaffolds around the units in order to check their condition and make recommendations as to what work had to be done. Petroff also had his men dismantle the units before plaintiff's crew came on the job. During the course of the work Petroff would come down to the basement at least twice a day to inspect and check whether tubes of the specified gauge were being used, and to see how the work was progressing generally. He did not, however, tell plaintiff's men when or how to do their work.
The retubing of the heat exchange units having been completed, plaintiff's employees on August 17, 1953 ran a hydrostatic test to determine if the job had been done in good, workmanlike manner. Instead of running the water through the tubes, the men by mistake ran it through the outer shell of the units. The shells could not withstand the water pressure and one of them cracked open from end to end. Plaintiff had to make good the damage, at a cost of $3,580. Defendant refused reimbursement under the policy because of the language of the exclusion clause.
It should be noted that at no time during the course of the work did plaintiff's men move the heat exchange unit or put it into operation.
We proceed to a consideration of the policy itself. The first page, devoted to "Declarations," has plaintiff's name and address typed in, but the space devoted to "Location of premises" was not filled in. The reason for this is fairly obvious; the parties undoubtedly understood that plaintiff would be doing boiler work at different locations during the life of the policy. Property damage liability was written for only one of the five listed hazards, "1. Premises  Operations." Under the fifth item of the "Declarations," dealing with "Purposes of Use," appears "1. Premises  Operations: Boiler Installation or Repair  steam  including construction or repair of foundations."
*604 The "Definition of Hazards" appearing on the second page of the policy defines "Premises  Operations" as "The ownership, maintenance or use of the premises, and all operations during the policy period which are necessary or incidental thereto." The "Exclusions" section provides that the policy was not to apply:
"(g) under Coverage B [Property Damage Liability], to injury to or destruction of property owned, rented, occupied or used by the insured, and with respect to divisions 1 [Premises  Operations], * * * of property in the care, custody or control of the insured."
It is defendant's contention that the damage for which plaintiff seeks reimbursement occurred to property "used" by the insured, or in its "care, custody or control."
After the close of plaintiff's case, defendant rested without offering any testimony. Both sides moved for judgment. The trial judge concluded that the exclusion clause did not apply, and entered judgment in favor of plaintiff in the sum of $3,580 with costs.
The rules of construction applicable to contracts of insurance are fairly uniform. They have received extended treatment in our cases and in the authorities. See, for example, 1 Couch, Cyclopedia of Insurance Law (1929), §§ 173-178, pp. 346 ff; 13 Appleman, Insurance Law and Practice (1943), §§ 7383-7388, pp. 10 ff., passim. They require only brief mention. When the policy of insurance is clear and unambiguous, the court is bound to enforce the contract as it finds it. James v. Federal Insurance Co., 5 N.J. 21, 24 (1950). The fundamental rule of construction is to arrive at and determine the intention of the parties as demonstrated by the language employed, when read and considered as a whole. "Effect, if possible, will be given to all parts of the instrument, and the construction which gives a reasonable meaning to all its provisions will be preferred to one which leaves a portion of the writing useless or inexplicable." Caruso v. John Hancock Mutual L. Ins. Co., 25 N.J. Misc. 318, 320-321 (Sup. Ct. 1947), affirmed o.b. 136 N.J.L. 597 (E. & A. 1948). In order not to lead to *605 unreasonable results or to defeat the intention of the parties, the construction of an insurance policy must not be strained, arbitrary or irrational, or strictly technical; rather it must be natural, reasonable and practical, having reference to the risk and subject-matter and to the purposes of the entire contract, unless a special meaning is shown by the context or the circumstances, or the language, viewed as a whole, gives rise to uncertainty or ambiguity. Gusaeff v. John Hancock Mutual L. Ins. Co., 118 N.J.L. 364, 367 (Sup. Ct. 1937); 1 Couch, Cyclopedia of Insurance Law (1929), § 177, p. 360 ff. It has been observed that while courts protect insurers against unjust claims, and enforce regulations necessary for their protection, "it must not be forgotten that the primary object of all insurance is to insure. A construction should be taken which will render the contract operative, rather than inoperative, and which will sustain the claim for indemnity, if reasonably possible, rather than exclude it." 13 Appleman, Insurance Law and Practice (1943), § 7386, p. 37.
Where the meaning of the words employed is doubtful or uncertain, or if for any reason any ambiguity exists either in the policy as a whole or in any portion of it, the insured should have the benefit of a favorable construction in each instance. Schneider v. New Amsterdam Cas. Co., 22 N.J. Super. 238, 243 (App. Div. 1952). As was said in that case, it is the almost universal rule that "insurance contracts must wherever possible be liberally construed in favor of a policyholder or beneficiary thereof, and strictly construed against the insurer in order to afford the protection which the insured sought in applying for the insurance." Ibid, page 242. This is especially so where an insurance contract is uncertain and the intention of the parties not clearly ascertainable from the policy itself. In such a case, the courts will take into consideration the apparent object or purpose of the insurance and, along with the context of the policy, the subject matter of the insurance, the situation of the parties, and the circumstances surrounding the making of the contract. Appleman, § 7383, p. 14; *606 Couch, § 174, p. 354. It might also be noted, in construing an ambiguous policy, that a person is unlikely to intend or consciously make an agreement unfair or useless to himself. American Shops, Inc. v. Reliance Ins. Co. of Philadelphia, 22 N.J. Super. 564, 567 (Law Div. 1952). Of course, if the words are unambiguous, they must be enforced even though the contract be inequitable, or even useless to the insured, for then the error is simply one of business judgment.
Exclusion clauses are strictly construed against the insurer, especially if they are of uncertain import. An insurer may, of course, cut off liability under its policy with a clear language, but it cannot do so with that dulled by ambiguity. As with the provisions of the policy as a whole, so also with the exceptions to the liability of the insured, the language must be construed so as to give the insured the protection which he reasonably had a right to expect; and to that end any doubts, ambiguities and uncertainties arising out of the language used in the policy must be resolved in his favor. Couch, § 187, p. 390; 1945 Cum. Supp., p. 185; 1956 Supp., p. 56.
Turning now to the "Exclusions" clause in the policy under consideration, the term "used" may be defined in a wide variety of ways. See Great American Indemnity Co. of N.Y. v. Saltzman, 213 F.2d 743, 746-747 (8th Cir. 1954), which explores many definitions of "use," and where it was held that an insured who trespassed upon and wrecked an airplane was not "using" it; Chaliss v. Commercial Standard Ins. Co., 117 Ind. App. 180, 182, 69 N.E.2d 178, 179 (App. Ct. 1946), holding that the insured's parking lot attendant who moved a customer's car was not "using" it; Hardware Mutual Cas. Co. v. Mason-Moore-Tracy, Inc., 194 F.2d 173 (2d Cir. 1952), where the insured who damaged an elevator while moving rug cleaning equipment was held to have "used" the elevator; and Lee v. Aetna Casualty & Surety Co., 178 F.2d 750 (2d Cir. 1949), a similar case.
Black's Law Dictionary (4th ed. 1951) defines "use" as (v) to convert to one's service, to avail one's self *607 of, to employ; and (n) the fact of being used or employed habitually, usage; the purpose served; a purpose, object or end of useful or advantageous nature. The Oxford English Dictionary also defines "use" as a purpose served; a purpose, object or end for useful or advantageous nature. Webster's New International Dictionary (2d ed. 1951) defines "use" as (v) to make use of, especially habitually or customarily; to convert to one's service; to put into operation; to cause to function. "Use" has these and many other meanings. Practically every activity of mankind, as was observed in the Great American Indemnity Co. case, above, would amount to a "use" of something, in the broadest sense of that word. But the term must be considered with regard to the setting in which it is employed. It was incumbent upon defendant, as the insurer, to so word the exclusion clause of the policy (if it was to be effective) that any conceivable contact of plaintiff with a boiler in the course of repairing it would come within the word "use." Since insurance contracts are phrased by the insurer, it is for the insurer to make them so clear that they contain no ambiguity as to their meaning; otherwise they must be construed most strongly against the insurer.
We are inclined to the view that the word "use," as used in the exclusion clause of the policy is ambiguous. But even if it were not, we would have no trouble in holding that plaintiff was not "using" the heat exchange unit in any sense of the word. The Great American Indemnity Co., Chaliss, Hardware Mutual Casualty Co. and Lee cases, cited above, reinforce this position; they suggest that an insured "uses" property within the meaning of the exclusion clause only where he puts it to his own service or to the purpose for which it was ordinarily intended.
No New Jersey cases have been found construing the phrase "care, custody or control." Such words are inherently ambiguous, for they are words of art which have been the focus of considerable judicial construction. The cases cited by defendant deal with policies issued to automotive repairmen and garage owners; for example, the *608 "care, custody and control" exclusion was held to apply where the car was in the insured's garage for the purpose of having a trailer hitch installed, John G. Speirs & Co. v. Underwriters at Lloyd's London, 84 Cal. App.2d 603, 191 P.2d 124 (D. Ct. App. 1948), or where an automobile was being driven from the owner's home to the insured's garage by the insured's agent, Root Motor Co. v. Massachusetts Bonding & Ins. Co., 187 Minn. 559, 246 N.W. 118 (Sup. Ct. 1932). Other cases cited by defendant reach the same result where the exclusion clause applied to cars "in charge of" the insured. State Automobile Mut. Ins. Co. v. Connable-Joest, Inc., 174 Tenn. 377, 125 S.W.2d 490 (Sup. Ct. 1939); Clark Motor Co. v. United Pacific Ins. Co., 172 Or. 145, 139 P.2d 570 (Sup. Ct. 1943); Guidici v. Pacific Automobile Ins. Co., 79 Cal App.2d 128, 179 P.2d 337 (D. Ct. App. 1947); Vaughn v. Home Indemnity Co., 86 Ga. App. 196, 71 S.E.2d 111 (Ct. App. 1952). None of these cases support defendant's position under the facts of this case, because in those situations the chattel was clearly within the "care, custody and control" or "in charge of" the insured. The Guidici case is particularly helpful in distinguishing this whole line of automobile or chattel cases from the case at bar. Automobile repairmen are bailees of the car they are repairing; as such, they not only have control and possession of the bailed automobile, but they have an exclusive right to possession supporting a lien for services until paid.
We have an entirely different case here. The heat exchange unit under repair was firmly attached to the owner's realty, and was functionally a part thereof. In Maryland Casualty Co. v. Hopper, 237 S.W.2d 411 (Tex. Ct. Civ. App. 1950), the insured had undertaken to lay flow lines connecting an oil well to a battery of two oil storage tanks, and to lay a pipeline from the gathering pipeline system to the tanks. One of the tanks exploded when an employee of the insured was heating a pipe in order to bend it, close to the tank. In holding that the tank was not within the insured's "care, custody or control," the court said that considering *609 the policy in its entirety, there could be no question but that its purpose was to protect the insured in his business of oil well servicing against accidental loss for which it might become liable because of injury to or destruction of the property of others. It noted that the policy made no specific designation of the premises covered  and that is the case here. The court held that if the description of hazards was to be given any effect at all, it must necessarily cover any property used by the insured in his business or necessary or incidental thereto. Noting that the tank in question was firmly attached to the realty so as to become a part of it, the court stated that "Certainly it could not have been contemplated by the owners * * * that such real estate should be placed in the care, custody or control of appellee during his operations. He was merely permitted to use the tanks * * * for the purpose of accomplishing the work he was employed to do." 237 S.W.2d, at page 416. So here as to the heat exchange unit.
Similarly, where the insured's workmen were making repairs at the owner's premises, it was held that the premises were not in the "care, custody or control" of the insured. A.T. Morris & Co., Inc. v. Lumber Mutual Cas. Ins. Co. of N.Y., 163 Misc. 715, 298 N.Y.S. 227 (Mun. Ct. 1937); Cohen v. Keystone Mutual Cas. Co., 151 Pa. Super. 211, 30 A.2d 203 (Super. Ct. 1943); Rex Roofing Co., Inc. v. Lumber Mutual Cas. Ins. Co. of N.Y., 280 App. Div. 665, 116 N.Y.S.2d 876 (App. Div. 1952). Clearly, plaintiff had no care or custody of the heat exchange unit as such, nor did he have control over it in the sense that a person who has personal property in his possession, such as an automobile, may be said to have control of it.
Plaintiff was repairing the heat exchange unit at the owner's premises. If anyone had "care, custody or control" over the damaged unit it was the owner, acting through its representative Petroff, who as maintenance engineer had general supervision over all parts of the building.
If we consider the intent of the parties in terms of the policy and its purpose, we cannot see how the exclusion *610 clause could apply in this case. Plaintiff was obviously interested in covering himself against the risks in the normal operation of his business. Cf. McAllister v. Century Indemnity Co., etc., 24 N.J. Super. 289, 294 (App. Div. 1953), affirmed p.c. 12 N.J. 395 (1953). It is clear that defendant understood this because of the typed insertion under "Purposes of Use" in the policy, where "Premises  Operations" were designated as "Boiler Installation or Repair  steam  including construction or repair of foundations." To read the exclusion clause the way defendant would have us, would strip plaintiff of a valuable part of the coverage whenever he was working on a heating fixture of the kind here involved. Such an unreasonable and nugatory result should not be allowed by the court if the ambiguities of the language permit of judicial construction. Maryland Casualty Co. v. Hopper, 237 S.W.2d 411 (Tex. Ct. Civ. App. 1950); Schneider v. New Amsterdam Cas. Co., 22 N.J. Super. 238 (App. Div. 1952); 1 Couch, Cyclopedia of Insurance Law, § 187, p. 390.
Affirmed.