**Huntingdon Industries, Incorporated v. Pennsylvania Manufacturers' Association Casualty Insurance Company**

*Dechert, Price & Rhoads*, for plaintiff.
*White & Williams*, for defendant.

JAMIESON, J., May 15, 1969.—In this assumpsit action, tried nonjury, plaintiff, Huntingdon Industries, Inc. (Huntingdon) seeks damages under a comprehensive liability insurance policy in which it is the insured and defendant, Pennsylvania Manufacturers' Association Casualty Insurance Company (PMA) is the insurer.

On June 21, 1962, at about 7:30 p.m., as a result of a fire at Huntingdon's plant located in Meadowbrook, Montgomery County, Pa., a large quantity of crude balata in the yard adjacent to Huntingdon's plant was destroyed. The balata, a rubber-like substance imported from Central and South America, was owned by Hermann Weber & Co., Inc. (Weber). Huntingdon processed balata exclusively for Weber, after which it shipped the processed balata to Weber's customers on notification from Weber and in cartons marked with Weber's name. Balata is used almost exclusively in the manufacture of golf ball covers.

Weber's insurance carrier, after paying Weber for the damage to the balata, commenced a subrogation action against Huntingdon for $412,000. PMA refused to assume the defense of that action and Huntingdon thereupon retained its own counsel. The Weber suit, filed in the United States District Court for the Eastern District of Pennsylvania, was terminated on May 1, 1967, with payment by Huntingdon to Weber of $55,000 in settlement. Huntingdon now seeks to recover from PMA (1) the amount paid in settlement, (2) counsel fee and costs incurred in defending the action totaling $11,318.59, and (3) the sum of $1,621.98 representing time spent by

Huntingdon's employes in preparing a defense to the action.

Defendant agrees that the amount paid in settlement of the Weber claim is reasonable.[1] It is denied, however, that there is liability under the terms of the policy. Defendant also contests the reasonableness of the counsel fee and denies that there is liability to pay for the time spent by plaintiff's employes in defense of the action.

Under the provisions of the comprehensive general liability insurance policy, PMA is obligated to pay on behalf of Huntingdon all sums which Huntingdon becomes legally obligated ". . . to pay as damages because of injury to or destruction of property." PMA is also obligated to defend any suit brought for the purpose of recovering such damages.

PMA's denial of coverage is based upon the policy provision excluding from coverage property in the care, custody or control of the insured.

There is little dispute about the facts. The more difficult question is whether they show that the balata was in the "care, custody or control" of Huntingdon at the time of the fire.

## I. FACTS

Since there is basic, although not complete, agreement about the background facts against which this determination must be made, we now set forth the pertinent facts as we find them.

At the time of the fire, approximately 780,000 pounds of crude balata were stored on Huntingdon's property, the bulk of it in an open-yard area a short distance from the processing plant. About 25,000

---

[1] Investigation into the cause of the fire indicated that it was very likely due to the negligence of Huntingdon's employes.

pounds of that total amount were in the plant being processed.[2]

For at least 20 years prior to the fire, Weber was Huntingdon's only customer. For most of this time the contractual arrangements between the parties were largely verbal. On December 31, 1961, the parties entered into their first formal agreement. This agreement, in effect at the time of the fire, provided that Huntingdon was obligated to process balata exclusively for Weber in exchange for Weber's guarantee to order the processing of a certain minimum poundage each year. Paragraph six of the agreement provided that Weber would keep Huntingdon "adequately supplied with balata to be processed in order to enable Huntingdon to schedule its processing on an efficient and economical basis." The written agreement did not, however, specify where the balata was to be stored until needed for processing, although it is clear that the place used for that purpose was Huntingdon's yard. The agreement likewise did not cover when and where the crude balata became Huntingdon's responsibility for safekeeping, processing or any other purpose related to its care, custody or control.

Turning from the written agreement, we find that Huntingdon had little to do with the crude balata prior to the time it was taken into its plant for processing. Purchasing and shipping arrangements for the crude balata were handled by Weber. Deliveries by common carrier to Huntingdon's premises were infrequent but in substantial quantities when made. At the time of the fire there was on hand a quantity of crude balata substantially in excess of the daily processing requirement of four to five thousand pounds.

---

[2] Huntingdon concedes that the balata inside the plant at the time of the fire was under its care, custody or control.

When the crude balata was delivered, Huntingdon's employes neither weighed nor checked the shipments. They did, however, sign the trucker's invoice on Weber's behalf to acknowledge receipt. Pursuant to instructions given in advance by Weber, Huntingdon's employes indicated to the truckers where the balata was to be unloaded.[3] At the time of the fire, the crude balata (which generally took the form of square blocks) was stored in 8 to 10 piles ranging from a hundred to several hundred feet from the processing plant. Storage at some distance rather than immediately adjacent to the plant was of benefit to Weber in reducing the premiums paid by it for insurance coverage on the balata. Although not covered in the written agreement, it was understood by the parties that Weber was to carry insurance on the crude balata, and Weber (or its insurer) had, in fact, borne the loss from two prior fires.

From the inception of its dealings with Weber, Huntingdon had permitted crude balata to be stored without charge in its yard. The balata, impervious to weather, stood uncovered, without special facilities of any kind,[4] and was not surrounded by protective fencing. Neither Huntingdon nor Weber furnished a guard. Since Huntingdon made no charge for the space occupied, the storage arrangement was obviously advantageous to Weber. Huntingdon also benefited in that an adequate supply of balata was close at hand. To compensate Huntingdon for the cost in-

---

[3] The crude balata came in varying degrees of quality and coloring and Weber gave specific stockpiling instructions so that when the balata was later processed, different piles of crude balata could be combined in accordance with certain formulas or mixes.

[4] However, for ease in handling drums of a solvent byproduct of the manufacturing operation, Weber did install, at its own expense, cement pads on Huntingdon's premises.

curred in transporting the crude material the short distance from where it stood on plaintiff's premises to the plant for processing, Weber paid Huntingdon at the rate of one-half cent per pound.[5]

Although the bulk of the balata was undoubtedly intended for processing at Huntingdon's plant, on occasion (at times as often as once or twice a month), Weber removed quantities of crude balata and shipped them to other customers. When so doing, Weber alone handled all the shipping arrangements.

Huntingdon received instructions from Weber as to the amount and type of the various kinds of crude balata it should use in its processing operation at any given time. The particular formula or mix was set by Weber to meet the needs of its individual customers.

Representatives of Weber visited the Huntingdon plant several times a month for the purposes, inter alia, of inspecting the crude balata, discussing with Huntingdon the production schedule and formula required to fill Weber's orders, and giving shipping instructions for the processed balata. To assist Weber in keeping track of its supply of crude balata for both purchasing and insurance purposes, Huntingdon supplied Weber with an approximate inventory of material on hand.

Huntingdon did not touch the crude balata at any time before it was needed in the processing operation. As Huntingdon needed additional crude material for processing, it was picked up, carried to the plant and weighed before the processing began. The finished

---

[5] Although it would have been somewhat less convenient for Huntingdon if the balata was stored on the property of a third party, but within a half-mile or so of the plant, it would have created no significant difficulty so long as Huntingdon was compensated for the cost of transporting the balata to its plant.

product was shipped to Weber's customers in cartons labeled with Weber's name and in accordance with Weber's instructions. Payment to Huntingdon by Weber was based on the weight of the processed balata.

## II. CARE, CUSTODY OR CONTROL

The exclusionary clause upon which PMA relies provides:

"This policy does not apply: . . . (h) under coverage B, to injury to or destruction of . . . (3) . . . property in the care, custody or control of the insured or property as to which the insured for any purpose is exercising physical control, . . ."[6]

The burden of establishing the affirmative defense of exclusion from coverage under this clause rests with defendant: Sykes v. Nationwide Mutual Insurance Co., 413 Pa. 640 (1964).

The "care, custody or control" clause has been the subject of frequent judicial interpretation. The language of the clause has been held inherently ambiguous by some courts, and clear and unambiguous by others. See Annotation, 62 A.L.R. 2d 1242 (1958). Just what measure of control, or right to control, is necessary for the clause to be operative is not clearly spelled out in the policy. It is apparent from review of the decisions that the applicability of this provision de-

---

[6] This is a standard policy provision. Until 1955, the words "or property as to which the insured for any purpose is exercising physical control" were not included in the standard clause. It has since been noted, and we believe aptly so, that inclusion of this "physical control" phrase is merely repetitive of, and included in, the concept of "care, custody or control": Elcar Mobile Homes, Inc. v. D. K. Baxter, Inc., 66 N.J. Super. 478, 169 A. 2d 509 (App. Div., 1961). For that reason, any references we make to the "care, custody or control" provision apply equally to the "physical control" phrase.

pends largely upon the facts and circumstances of each case. Cf. Gibson v. Glens Falls Insurance Co., 241 S.C. 293, 128 S.E. 2d 157 (1962); Hardware Mutual Casualty Co. v. Crafton, 233 Ark. 1020, 350 S.W. 2d 506 (1961).

Attempts to define the key words of the clause, although enlightening, serve primarily to emphasize the factors to be considered in determining whether the property damaged or destroyed falls within the ambit of the exclusionary clause. Thus, in Hardware Mutual Casualty Co. v. Crafton, supra, the court noted, page 1023:

"In a general way . . . 'care' has reference to temporary charge; 'custody' implies a keeping or guarding and a necessity for an accounting, and 'control' refers to power or authority to manage, superintend, direct or oversee."

It is clear that mere right of access to the damaged property is not enough to bring the clause into play: Gibson v. Glen Falls Insurance Co., supra, and Christ v. Maryland Casualty Co., 18 D. & C. 2d 700 (1959). Nor is physical presence of the damaged property on the premises of the insured alone sufficient: Hardware Mutual Casualty Co. v. Crafton, supra. Similarly, the fact that the property damaged is incidental to or adjacent to the property upon which work is being done by the insured has been held insufficient to place it in the care, custody or control of the insured: Hardware Mutual Casualty Co. v. Crafton supra; Maryland Casualty Co. v. Jolly 67 N.M. 101, 352 P.2d 1013 (1960); and International Derrick & Equipment Co. v. Buxbaum, 240 F.2d 536 (3rd Cir. 1957).

In a clear-cut bailment arrangement, there is little difficulty in applying the exclusionary clause. In such cases, the property damaged is clearly under the supervision of the insured and the working of the

clause is thus clearly and unambiguously applicable: International Derrick & Equipment Co. v. Buxbaum, supra. It is in the other factual situations where the insured has some measure of contact with the damaged property, short of a bailment, that the clause is ambiguous and difficult of interpretation. In these situations we must be guided by the principle that ambiguities arising out of the language used in the policy must be resolved in favor of giving the insured the protection which he reasonably has a right to expect: Sykes v. Nationwide Mutual Insurance Co., supra; Boswell v. Travelers Indemnity Co., 38 N.J. Super. 599, 120 A.2d 250 (App. Div., 1956); and Elcar Mobile Homes, Inc. v. D. K. Baxter, Inc., 66 N.J. Super. 478, 169 A.2d 509 (App. Div., 1961).[7]

Applying the foregoing principles to the instant case, we are satisfied that PMA has not carried its burden of proof. The difficulty confronting PMA is that the factors one looks to in ascertaining whether care, custody or control exist simply do not point to Huntingdon. On the contrary, the facts indicate that Weber, the title owner of the balata, retained for itself the basic elements of control covered by the exclusionary clause.

Looking first at the written agreement executed in December of 1961, we find an obligation upon Weber to furnish an adequate supply of crude balata. This, by itself, falls far short of spelling out when the crude balata is to come within the care, custody or control of Huntingdon.

Nor do the surrounding circumstances indicate any meaningful duties or rights on the part of Huntingdon with regard to the property. The balata was on the premises chiefly for processing. Huntingdon's right

---

[7] For helpful discussion and analysis of the care, custody or control exclusionary clause, see the Elcar case.

of access for this purpose was limited to removal of balata from certain piles in quantities indicated by Weber. There was no charge for the use of the premises for storage, no meaningful protective services furnished, and there was no physical contact by Huntingdon with the material until such time as it was actually needed for processing.

Prior to the time that the actual processing began, Huntingdon's contacts with the crude balata were hardly different than if the balata had been stored by Weber several miles away from the plant. The giving of instructions by Huntingdon employes to the truck drivers who delivered and unloaded the crude balata can hardly be considered as bringing the balata into Huntingdon's control. We reach the same conclusion regarding Huntingdon's maintenance of a rough inventory for Weber's benefit with regard to supply and insurance. Under the circumstances of this case and the law as we know it, this act of bookkeeping is insufficient to bring the exclusionary clause into effect.

On the contrary, the parties clearly recognized the obligation of Weber to protect its interest in the balata by maintaining property damage insurance coverage. Further, although the vast bulk of crude material was to be used by Huntingdon in production, there always remained the possibility that material would be shipped elsewhere by Weber without ever undergoing the manufacturing process.

PMA suggests that where the property damaged or destroyed is (1) on the premises of the insured and (2) is the very property which it was intended that the insured process, the only reasonable conclusion is that the property was in the care, custody or control of the insured. We note, first, that all of the balata was not necessarily destined for processing by Hunting-

don. Second, the cases cited by PMA either do not support PMA's proposition or are factually distinguishable.

PMA relies primarily upon Kershaw v. Maryland Casualty Co., 172 Cal. App. 2d 248, 342 P.2d 72 (1959). In Kershaw, the insured agreed to process certain beet pulp, utilizing an airstrip leased for that purpose by the owner of the beet pulp. The agreement of the parties provided that after the pulp had been processed and sacked, it was to be left in the open and picked up by the owner. The court held that the pulp which had been processed and set aside was not under the care, custody or control of the insured. It found that the remaining unsacked pulp was in the insured's care, custody or control. As we understand the facts of that case, however, while the unsacked pulp was on the airstrip, it was, in fact, already in a stage of processing and under the control of the insured. That is, the initial stages of beet processing involved the drying and spreading of the beet pulp, and it was properly held that the pulp in this stage was in the care, custody and control of the insured. This conclusion is made even clearer from the fact that it was the insured's employes who actually did the spreading of the pulp on the airstrip. Kershaw therefore, lends no support to PMA's position.

The other authorities cited by PMA are likewise of little assistance. Thus, we accept the fact that automobiles left for repair,[8] property left with and handled by warehousemen,[9] property being physically moved[10] or unloaded,[11] are clear instances of bail-

---

[8] Maryland Casualty Co. v. Holmsgaard, 10 Ill. App. 2d 1, 133 N.E. 2d 910 (1956); c.f. Christ v. Maryland Casualty Co., supra.

[9] Warner v. Employers' Liability Assurance Corp., 390 Pa. 62 (1957)

[10] International Derrick & Equipment Co. v. Buxbaum, supra.

[11] Brunson v. Iowa Home Mutual Cas. Co., 224 F. Supp. 592 (D.C.S.D. 1963)

ments, placing the property in the care, custody and control of the bailee. Again, however, as already discussed, they are factually inapposite to the instant case.

Of the many cases cited by counsel, we find Mayronne Mud & Chemical Corporation v. T-W Drilling Co., 168 F. Supp. 800 (E.D. La., 1958), factually apposite and particularly helpful. In that case, Humble Oil Company hired plaintiff to supply mud to defendant drilling company for use in off-shore oil well drilling. Plaintiff chartered a barge on which to store the mud. This barge was kept adjacent to the floatable submersible drilling barge operated by defendant. As sacks of mud were needed, defendant obtained them from the mud barge for transfer directly into the mud tanks on the drilling barge. A blowout of the well being drilled by defendant caused damage to the adjacent mud barge and plaintiff's supply of mud. The court said, page 803:

"In effect, the owner had furnished, and kept supplied, a floating warehouse from which the contractor could draw his mud. If the owner had furnished a similar warehouse on land adjacent to a land drilling operation, no one would seriously urge that such warehouse and its contents were under the 'care, custody or control' of the contractor. The fact that the operation was over water does not change the principle involved nor require a different result. The question is simply one of dominion and control. In the circumstances in suit, Humble, not T-W (defendant), exercised dominion and control of the barge and its cargo. T-W merely had the right to go aboard the barge to obtain mud as needed for the drilling operation. This right did not place the barge and its contents under the 'care, custody and control' of T-W and within the exclusionary language of the policy."

So here, the right to fetch crude balata from Weber's inventory on Huntingdon's premises, in the

absence of any other significant factors of control, falls short of placing the balata under Huntingdon's care, custody or control.

In Mayronne, the court further pertinently noted, page 803:

"It is admitted that the interpretation herein placed on the words 'occupied or used by' and 'care, custody or control,' is not free from doubt. In fact, in some respects, it may be at variance with the dictionary definitions. But dictionary definitions do not reflect the legal gloss to which these words have been subjected. Nor do they relieve the insurer of the burden of proving non-coverage under the exclusions in the policy. (cases cited) The insurer must, at its peril, make the policy exclusions clear and unmistakable. (cases cited) The insurer was bound to know the type of business in which T-W, its assured, was engaged. . . . If the insurer wanted to exclude from coverage the supplies and equipment furnished its assured by other contractors, it should have said so in the policy so that now it would not be reduced to taking refuge in generalities."

This reasoning applies equally to the instant case. Had the insurer wanted to exclude from coverage materials furnished for, but not yet in a stage of, processing, it should have said so. See Aetna Casualty & Surety Co. v. Haas, 422 S.W. 2d 316 (Mo., 1968). It did not, and the definitions of the words used in the exclusionary clause cannot be strained to accommodate defendant's view.

Accordingly, PMA should have defended the suit brought by Weber against plaintiff. Having failed to do so, PMA must reimburse Huntingdon for the $55,000 expended by it in settlement of the suit by Weber.

### III. COUNSEL FEE AND EXPENSES

PMA does not dispute that it is liable for the costs of substitute counsel and other expenses of defense incurred by Huntingdon if it was obligated to undertake the defense of Huntingdon but failed to do so: Gedeon v. State Farm Mutual Automobile Insurance Company, 410 Pa. 55 (1963). See also Vanderveen v. Erie Indemnity Co., 417 Pa. 607 (1965); King v. Automobile Underwriters, Inc., 409 Pa. 608 (1963); and Cadwallader v. New Amsterdam Casualty Company, 396 Pa. 582 (1959). It does question, however, the reasonableness of the $10,000 fee paid to Huntingdon's attorneys for services in defending the Weber suit.

Based on the testimony of Huntingdon's counsel outlining his efforts and the efforts of members of his firm on behalf of Huntingdon, we find the compensation reasonable. The fee properly takes into account the usual factors of time, effort and results achieved: Canon 12, Canons of Professional Ethics of the American Bar Association. We find no merit in the contention that the fee should be reduced because counsel for Huntingdon spent more time than was necessary in preparing a defense. PMA does not contend that Huntingdon's counsel did not spend the time for which the client was billed or that the hourly rate was excessive. We are satisfied that the time was reasonably spent in preparation of an adequate defense on a matter of great importance to Huntingdon. We will not, therefore, speculate about the working habits and comparable abilities of different attorneys. Nor are we moved by the argument that Huntingdon would have employed counsel in any event because of exposure to possible liability beyond the policy limits. This observation is probably correct. We have no way of measuring, however, just how active a part counsel would have played in assisting PMA's attor-

ney. The fact is, PMA did not defend and we cannot conjecture about what might have been.[12]

Since there is no contest over the costs expended of $1,318.59, this amount is also recoverable.

Huntingdon's final claim is for $1,621.98, representing compensation for the time spent by its employes assisting in preparation of the defense. PMA's position is that it has no obligation under the insurance agreement for this expense.

Under the heading of "Defense, Settlement, Supplementary Payments," the policy provides that the insurer shall:

"(b) . . . (4) reimburse the insured for all reasonable expenses, other than loss of earnings, incurred at the company's request."

PMA does not contend that had it defended the action, it would not have requested assistance from Huntingdon. Hence, having improperly refused to defend, it cannot be relieved of liability simply because the work of Huntingdon's employes was not "incurred at the company's request."

The parties have not referred us to any cases specifically construing what is meant by "loss of earnings," nor have we seen any. However, in Long, The Law of Liability Insurance, Vol. 2, §14.01 (1969), in a discussion of the standard policy clause requiring the insured to assist the insurer in the defense of any action,[13] the author notes:

[12] In any event, Gordon Gerber, Esq., who represented Huntingdon in the Weber matter, testified that his involvement would probably have been minimal because of his confidence in the ability of Thomas Raeburn White, Jr., Esq., counsel for PMA.

[13] That standard clause is included in the policy before us, and in its pertinent portion reads: "The insured shall cooperate with the company and, upon the company's request, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits."

"The insurer does not intend that the insured shall do any of these required things at his own expense; he need only contribute his time. Hence, the condition provides that 'the company shall reimburse the insured for any expense, other than loss of earnings, incurred at the company's request'. More recent editions of liability insurance policies include actual loss of wages, not to exceed $25.00 per day, occasioned by attendance at hearings or trials at the insured's request."

From the above discussion, we take it that time spent by the insured participating in preparation of a defense is equated with "loss of earnings." Accordingly, were the insured in this case a sole proprietor, we would have no difficulty in reaching the conclusion that the time spent by the insured assisting the insurer in preparing a defense would be written off as unreimbursable "loss of earnings."

We see no reason for making a distinction where the insured is a corporation and the time expended in working with the insurer is rendered by the corporate employes. A contrary conclusion would render the phrase meaningless. We hold, therefore, that Huntingdon is not entitled to reimbursement for the expense of the time spent by its employes.

## ORDER

And now, May 16, 1969, enter verdict for plaintiff, Huntingdon Industries, Inc., against defendant, Pennsylvania Manufacturers' Association Casualty Insurance Company, in the amount of $66,318.59, with interest on $55,000 to be computed at the legal rate commencing as of May 1, 1967, and interest on $11,318.59 to be computed at the legal rate commencing as of May 31, 1967.

JAMIESON, J., December 29, 1969.—
SUPPLEMENTAL OPINION

This case involves a dispute over liability insurance coverage. Plaintiff, Huntingdon Industries, Inc. (Huntingdon) sued its insurer, Pennsylvania Manufacturers' Association Casualty Insurance Company (PMA) to recover, inter alia, the sum of $55,000 paid by Huntingdon in settlement of a claim of Herman Weber & Co., Inc. (Weber) for destruction and damage to crude balata owned by Weber. The destruction and damage of the balata occurred as a result of a fire while the rubber-like material was stored on Huntingdon's premises. We heard the case without a jury and rendered a verdict for plaintiff in the total amount of $66,318.59, including therein the $55,000 sum paid by Huntingdon to Weber. An opinion has already been filed setting forth our factual findings and the reasons in support of the verdict.

At the trial, both parties agreed that the balata inside the plant at the time of the fire was under the care, custody or control of Huntingdon and, consequently, excluded from coverage under the liability policy. The basic dispute was whether the much more substantial amount of balata located in the yard area of plaintiff's premises not being processed at the time of the fire, was also excluded from coverage under the terms of the care, custody or control provision. Defendant's position was that the $55,000 settlement of Weber's $412,000 claim was solely the responsibility of Huntingdon, as *all* of the balata on Huntingdon's premises, inside and outside the plant, was under the care, custody or control of plaintiff.

After a verdict in plaintiff's favor, defendant, in one of its exceptions, contended for the first time that it should receive credit for that proportionate part of the $55,000 settlement representing payment for the

damage done to balata in the processing stage at the time of the fire. On this exception, we ordered a supplemental hearing "to ascertain the value of balata located within plaintiff's plant at the time of the fire which was destroyed by the fire and to determine what amount, if any, should be subtracted from that part of plaintiff's recovery which represented its settlement with Herman Weber & Co., Inc., i.e., $55,000.00." All other exceptions were denied. We have had the supplemental hearing and the issue is ready for decision.

Despite defendant's failure to pursue at trial the question of apportioning the settlement, we do not deem it waived as it would be obviously unfair to compel payment for something defendant did not contract to cover. Especially is this so since Huntingdon does not dispute that the balata in process was excluded from coverage by the "care, custody or control" provision in the policy.

Huntingdon argues that had PMA undertaken the defense, as we have determined it should have done, its liability would have been $55,000 without any question of a credit or a contribution from Huntingdon, particularly since the overwhelming amount of balata involved was actually in storage rather than processing. Accordingly, it is argued that PMA should not now be allowed a reduction in its liability which it would not have been entitled to had it met its obligation.

We disagree. The fact is that the settlement, whether the parties thought about it or not, covered a claim for all balata damaged. Various factors, such as disputed liability and contested damages, were obviously taken into account in reaching the settlement figure. However, when reached, that figure was based upon the total damage done. Accordingly, it is in

keeping with the contractual intent of the parties that PMA be entitled to some credit. Whether PMA could have settled at the same figure and whether contribution from PMA would have been involved is a question about which we will not speculate. Defendant acted in good faith in refusing to defend the action brought by Weber and we reject plaintiff's contention that defendant should now be penalized for failing to accept responsibility initially under the policy.

The parties are not in agreement, assuming a credit is to be given, as to what the amount should be. Based on the testimony at the supplemental hearing, we find that of 24,199 pounds of several types of balata in process at the time of the fire, 18,979 were destroyed. At an average value of $.61 per pound, the dollar loss was $11,577.19. Approximately 3,200 pounds of finished balata, valued at $2.85 per pound, a total of $9,120, was also destroyed. The total value of the destroyed balata properly chargeable to Huntingdon, therefore, amounted to $20,697.19.

We further find that the crude balata stored on Huntingdon's premises but not in processing totaled 759,202 pounds. The fire destroyed 96,318 pounds, 480,000 pounds were substantially damaged and 182,884 pounds were not harmed. The average value of the yard balata was $.60 per pound. The approximately 480,000 pounds damaged but not destroyed were repurchased about one and a half years after the fire by Weber from its insurance carrier at $.18 per pound. Based on these figures, we find that the average damage per pound was $.42 or $201,600. Adding to this the value of the 96,318 pounds totally destroyed, or $57,790.80, we find that the loss by way of damage or destruction to the crude balata in the yard totaled $259,390.80. The total value of balata destroyed or damaged amounted to $280,087.99 and

Huntingdon's share of the $55,000 settlement should be $20,697.19 divided by $280,087.99 (7.389 percent) multiplied by $55,000 or $4,064.

PMA argues that Huntingdon offered insufficient evidence at the supplemental hearing on the issue of damages to permit us to reach a proper apportionment. We are satisfied that the evidence submitted, taken from inventories prepared both by Huntingdon and Weber, was substantially accurate and permitted us to fairly estimate the amount of damage and how it should be divided. This is all that the law requires: Ashcraft v. C. G. Hussey & Company, 359 Pa. 129 (1948); Commonwealth, for use v. Stein, 326 Pa. 225, 228-29 (1937).

## ORDER

And now, December 29, 1969, the verdict heretofore entered on May 16, 1969, is amended to read, "Enter verdict for plaintiff, Huntingdon Industries, Inc., against defendant, Pennsylvania Manufacturers' Association Casualty Insurance Company, in the amount of $62,654.59, with interest on $50,936 to be computed at the legal rate commencing as of May 1, 1967, and interest on $11,318.59 to be computed at the legal rate commencing as of May 31, 1967."