PAKTANK LOUISIANA, INC., et al.

v.

MARSH & McLENNAN, INC., et al.

Civ. A. No. 81–1529.

United States District Court,
E.D. Louisiana.

April 15, 1988.

Ronald A. Johnson, Johnson & McAlpine, New Orleans, La., for Paktank Louisiana, Inc. and Underwriters at Lloyds and British Companies, subscribing to insurance evidenced by Bland, Payne Cover Note No. 4700791.

Margot Mazeau, and George W. Healy, III, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for Arkwright–Boston Manufacturers Mut. Ins. Co. and Mut. Marine Office, Inc.

William J. Hamlin, and Michael T. Tusa, Jr., Walker, Bordelon, Hamlin & Theriot, New Orleans, La., for Marsh & McLennan, Inc., Marsh & McLennan, Inc. of Delaware and Marsh & McLennan, Inc. of Texas.

## MEMORANDUM OPINION

MENTZ, District Judge.

This litigation arises out of a fire at the docking facility of Gold Bond Building Products Division of National Gypsum Company (Gold Bond) on April 19, 1977. One month earlier, on March 18, 1977, Gold Bond contracted with Paktank Louisiana,

Inc. to grant Paktank the non-exclusive use of its dock for Paktank's marine terminal operations. Pursuant to the terms of the agreement, Paktank commenced construction of improvements to the dock, including installation of a crane, a product pipeline, and some collection facilities for spillage from product transfers. On April 19, 1977, while Paktank's improvements were still under construction, a fire destroyed a portion of Gold Bond's docking facility, as well as Paktank's improvements thereto.

As a result of the fire, Gold Bond filed suit for damages in the amount of $1,500,000 against Paktank and the contractor for Paktank's improvements, I.C.M. Corporation (I.C.M.), alleging that the negligence of Paktank and I.C.M. caused the fire. Underwriters at Lloyds and British Companies subscribing to Bland, Payne Cover Note No. 4700791 (Underwriters), which issued a property and business interruption policy to Paktank, took up Paktank's defense and paid all expenses of the litigation. There is no evidence that Lloyds defended under a reservation of rights.

During trial, Underwriters made a formal demand for settlement contribution from Arkwright–Boston Manufacturers Mutual Insurance Company (Arkwright–Boston), Paktank's liability insurer, and Mutual Marine Office, Inc., (MMO) who wrote the coverage. Arkwright–Boston and MMO refused the demand and thereafter, Underwriters paid Gold Bond $400,000 in settlement. Paktank waived its claim for $125,000 for damage to its own property and Underwriters waived Paktank's $10,000 deductible. I.C.M. contributed $50,000.

In the present action, plaintiffs, Paktank and Underwriters, seek indemnity in the amount of $400,000 from defendants, Arkwright–Boston and MMO, for the sums paid in settlement to Gold Bond.[1] Defendants filed a cross-claim against Marsh & McLennan, Inc., Marsh & McLennan, Inc.

of Delaware, and Marsh & McLennan, Inc. of Texas (Marsh & McLennan) seeking indemnification in the event that liability is imposed on defendants by reason of any binders issued by Marsh & McLennan without having been authorized to do so. The principal question for the Court to resolve is the extent, if any, to which the Underwriters property policy and the Arkwright–Boston liability policy provide coverage for the damage sustained to Gold Bond's property.[2] Each insurer denies coverage under its own policy and points to the other insurer as providing coverage.

The parties agreed to submit the case on the briefs and documents without trial. Having considered the arguments of counsel, the evidence, and the applicable law, the Court finds that the Underwriters policy does not cover Gold Bond's property loss and that the Arkwright–Boston policy covers only liability for the loss of Gold Bond's hopper and conveyor system.

*The Underwriters Policy*

The dispute with respect to coverage under the Underwriters policy concerns the following clause found in Section B—Physical Damage Coverage:

1. PROPERTY INSURED:

(a) All Real and Personal Property (including improvements and betterments), of every kind and description, owned by the Insured or the property of others for which the Insured may be liable, including while under construction except as specified in PROPERTY EXCLUDED.

Plaintiffs contend that the Underwriters policy does not cover Gold Bond's property loss because the phrase "the property of others for which the Insured may be liable" refers to a bailment, which did not exist between Paktank and Gold Bond. Plaintiffs urge that Section B be read together

---

1. Plaintiffs' complaint also named Marsh & McLennan, Inc., Marsh & McLennan, Inc. of Delaware, and Marsh & McLennan, Inc. of Texas alleging that they failed to obtain insurance coverage for the claim asserted against Paktank in the Gold Bond suit. Plaintiffs later dismissed

the Marsh & McLennan defendants so that plaintiffs' only remaining demand is directed against Arkwright–Boston and MMO.

2. There is no question that the Underwriters policy covers Paktank's loss of its own property.

with Section D—Liability Imposed By Law, which provides in part:

1. PAYMENT FOR LOSS
   To pay on behalf of the Insured,
   (a) All sums which the Insured shall become obligated to pay to any person or organization by reason of the liability imposed by law upon the insured as a warehouseman or bailee for loss or destruction of or damage to property contained in the Insured's premises, excluding all liability for loss, destruction or damage of every kind occurring away from the premises of the Insured, and caused by an occurrence.

   .     .     .     .     .

3. EXCLUSION
   This section does not apply:
   (a) to any liability assumed by the Insured under any contract or agreement except liability assumed on warehouse receipts issued by the Insured;

   .     .     .     .     .

Defendants argue that the express terms in Section B of the Underwriters policy provide coverage for any liability Paktank might have for the property of others. It cannot refer to a bailment, they argue, because Section B includes coverage for property "under construction" which cannot be the subject of a bailment. They also argue that the policy did not provide that Section D be read together with or as a limitation upon Section B.

■ The fact that Section B speaks of property "under construction" does not preclude coverage under that Section for bailed property. Defendants do not cite, and this Court has not found, any authority for the proposition that property under construction cannot be the subject of a bailment. To the contrary, the following authorities, while not directly on point, suggest that property under construction can be the subject of a bailment: *International Images, Inc. v. Smith,* 171 Ga.App. 172, 318 S.E.2d 711 (1984) (Owner of shed, which was used by lessee to store materials

for and construct a custom pontoon boat, was a bailee for hire); *Star Iron & Steel Company v. Pierce County,* 5 Wash.App. 515, 488 P.2d 776 (1971) (Where it was held that a manufacturer of custom-engineered, heavy-duty cranes and hoisting equipment did not have a taxable interest in such property. The court stated at page 783 that were it to find otherwise, "every bailee of personal property would be subject to taxation on the bailed property he held") [3]; *McLarty v. Shirley,* 122 Ga.App. 786, 178 S.E.2d 753 (1970) (A fire truck belonging to the City of Atlanta was bailed to the plaintiff for the purpose of rebuilding it).

■ The phrase, "the property of others for which the Insured may be liable," clearly refers to a bailment situation. This fact is apparent not only upon a plain reading of the entire policy, including Section D, which specifically limits Paktank's liability for loss imposed by law to a warehouseman or bailee situation, but also upon review of the relevant legal authorities.

[C]ourts have almost uniformly held that if, from the contract construed in its entirety, the fair interpretation and construction of the insurance contract is that it was intended primarily to cover the property held by the insured, then "liable," as used within the policy, does not refer to any fixed legal liability of the insured to respond in damages, but should be construed more broadly to mean "responsible."

*Folger Coffee Company, Inc. v. Great American Insurance Company,* 333 F.Supp. 1272, 1274 (W.D.Mo.1971). Without question, the Underwriters policy provides insurance on property and does not cover the legal liability of Paktank to respond in damages.[4] This Court finds that the phrase "the property of others for which the Insured may be liable" is an unambiguous phrase providing property damage coverage for the property of others where Paktank has a present and existing general responsibility by virtue of a

---

3. The court in *Timber Traders, Inc. v. Johnston,* 87 Wash.2d 42, 548 P.2d 1080 (1976), overruled *Star Iron & Steel* in part on grounds unrelated to the proposition for which it is cited herein.

4. Defendants admit this fact on page 11 of their Memorandum of Fact and Law.

bailment. It does not provide coverage for any contingent liability based in negligence. *See United States v. Globe & Rutgers Fire Insurance Company*, 104 F.Supp. 632 (N.D.Tex.1952), *aff'd.*, 202 F.2d 696 (5th Cir.1953); *Northwest Insurance Company v. Albrecht*, 22 Wash.App. 16, 587 P.2d 1081, 1085–86 (1978); *Penn v. Commercial Union Fire Insurance Company of New York*, 233 Miss. 178, 101 So.2d 535 (1958); Annotation, *Fire Insurance–Insured's Bailor*, 67 A.L.R.2d 1241, 1255. There being no question that Paktank was not Gold Bond's bailee or warehouseman, the Underwriters policy does not cover the loss of Gold Bond's property.

■ This Court recognizes, of course, that there are situations other than bailment where one might be "liable" for the property of others—for example, by virtue of a rental, leasing, or borrowing agreement. But, in the case at bar, Section D of the Underwriters policy specifically excludes "liability assumed by [Paktank] under any contract, except liability assumed or agreement on warehouse receipts." Even if the Underwriters policy did not contain this exclusion, the agreement between Paktank and Gold Bond did not place any general responsibility on Paktank for Gold Bond's property. In addition, the interest conveyed to Paktank was not a lease, but a license. This characterization is important because, under the governing law of New York,[5] a license does not convey any interest in the property itself such as would be associated with an existing liability or responsibility for the property. *See Lahti v. State*, 98 Misc.2d 829, 414 N.Y.S.2d 607, 609–10 (Ct.Cl.1979). "A license is a mere privilege or permission given by the owner of land authorizing another to enter and to use or occupy the land or part of it for any special purpose." *Kaypar Corporation v. Fosterport Realty Corporation*, 1 Misc.2d 469, 69 N.Y.S.2d 313, 316 (Sup.Ct.) (quoting Walsh, *Law of Property*, 2d Ed., Sec. 150), *aff'd*, 272 A.D. 878, 72 N.Y.S.2d 405 (App.Div.1947). "A

tenant has something more than a mere privilege or license; he has ownership, exclusive and as against all the world including his landlord, and if this be absent in any disputed case the relationship of landlord and tenant *does not exist.*" *Kaypar*, 69 N.Y.S.2d at 316 (quoting Walsh at Sec. 148). "It is the transfer of absolute control and possession of property at an agreed rental which differentiates a lease from other arrangements dealing with property rights." *Miller v. City of New York*, 39 Misc.2d 424, 240 N.Y.S.2d 716 (Sup.Ct.1963) (quoting *Feder v. Caliguira*, 8 N.Y.S.2d 400, 404, 208 N.Y.S.2d 970, 171 N.E.2d 316 (1960)).

Paktank did not have exclusive possession or use of the dock; it was restricted from interfering with Gold Bond's use of the dock and Gold Bond's vessels had prior right of use where Westwego was the first port of call. Gold Bond continued its use of the dock for its own business and, in conjunction therewith, maintained a hopper and conveyor system on the dock for transporting gypsum rock. Paktank had no right to use this hopper and conveyor system. Paktank was authorized to use Gold Bond's dock only for the docking and berthing of vessels. Paktank could assign its right of use, but only to its wholly-owned subsidiary and not without prior written consent from Gold Bond. Clearly, the nature of the rights granted to Paktank are those of a license, rather than a lease. In addition, the agreement itself refers to the interest that is granted as a "license," as does Gold Bond's complaint against Paktank, wherein Gold Bond alleged that "On or about March 18, 1977, Paktank obtained a license to use the aforementioned wharf and docking facilities from Gold Bond."

■ Considering the nature and terms of the agreement, Paktank did not have a property interest in the dock. While Paktank may have a property interest in the agreement itself, its interest in the dock is but a mere license or personal privilege.

---

5. Defendants erroneously argue that Louisiana law governs as the law of the place of performance. Instead, New York law governs as it was specifically chosen by the parties and does not violate any strong public policy considerations in Louisiana. *See Davis v. Humble Oil & Refining Company*, 283 So.2d 783, 794 (La.App. 1st Cir.1973).

As such, it cannot be said that Paktank had any existing liability or responsibility for Gold Bond's dock. Indeed, Paktank did not even have an insurable interest in Gold Bond's dock, except perhaps as to the value of use during the unexpired term of the agreement and the value of its own improvements and personal property. *See Anderson v. State Farm Fire and Casualty Company,* 397 N.W.2d 416 (Minn.Ct. App.1986). Thus, even if the Underwriters policy did not limit coverage for the property of others to a bailment situation, the policy would not cover the loss of Gold Bond's property.

### The Arkwright–Boston Policy

■ The Arkwright–Boston policy provides liability coverage to Paktank for wharfinger's legal liability[6] and marine liability. The marine liability insurance section provides that it covers Paktank "as terminal operator's at, See End. No. 1 [Paktank Louisiana, Inc., Westwego, Louisiana], arising out of his operations that are not otherwise excluded hereunder." Defendants contend that the marine liability section does not provide coverage because the operations alleged to have caused the fire did not constitute terminal operations; they were conducted by I.C.M. rather than by Paktank; and they were not conducted at Paktank's terminal at Westwego, Louisiana. Paktank contends that it is covered under the marine liability insurance section as any liability it may have had for the loss of Gold Bond's property arose out of its operations. Specifically, Paktank contends that as the policy does not define "operations" and does not exclude coverage for construction activities, the policy provides coverage for Paktank's legal liability arising out of its construction activities.

This Court agrees that the construction activities in question were "operations" of Paktank. Even though the construction work alleged to have caused the fire was actually performed by I.C.M., it was performed at Paktank's request to facilitate Paktank's terminal operations. Thus, the construction work was part of and necessary to Paktank's terminal operations. In addition, the policy does not provide that it covers only operations conducted at Paktank's terminal in Westwego, Louisiana. The policy refers the reader to Endorsement No. 1, which is entitled "NAMED INSURED." The Endorsement lists only the named insureds and the cities where they are located, but does not set forth any specific locations or addresses. The particular listing in question reads "Paktank Louisiana, Inc., Westwego, Louisiana." Considering the inexactness of this listing, the Court would be constrained to find that coverage is limited to operations conducted at Paktank's *terminal* in Westwego, Louisiana. Even assuming that the policy did contain such a limitation, the operations in question would fall within it because they were conducted in Westwego, Louisiana at Gold Bond's docking facility. Inasmuch as Paktank had a license to use Gold Bond's dock for its terminal operations, Paktank's terminal included the facilities it was constructing at Gold Bond's dock. Accordingly, the marine liability insurance section is applicable to the loss of Gold Bond's property.

■ Nevertheless, coverage for Gold Bond's dock is excluded under Exclusion "H" of the Arkwright–Boston policy because it was property "used by the insured." Exclusion "H" under the marine liability section of the Arkwright–Boston policy excludes liability coverage for property damage to:

(1) property owned or occupied by or rented to the insured,

(2) property used by the insured, or

(3) property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control; ...

Having already found that Gold Bond and Paktank formed only a license granting Paktank the non-exclusive use of Gold

---

**6.** There is no question that the wharfinger's legal liability insurance does not cover Paktank for the loss of Gold Bond's dock. That section provides coverage for damage to any interest on board any vessel or property damage caused by any of Paktank's vessels.

Bond's dock, the exclusions under H(1) and H(3) are inapplicable.

With regard to the exclusion under H(2), "an insured 'uses' property within the meaning of the exclusion clause only where he puts it to his own service or to the purpose for which it was ordinarily intended." *Alderman v. The Hanover Insurance Group*, 169 Conn. 603, 607, 363 A.2d 1102, 1105 (1975) (quoting *Boswell v. The Travelers Indemnity Co.*, 38 N.J.Super. 599, 607, 120 A.2d 250, 254 (App.Div.1956); *see Saltzman v. Great American Indemnity Co. of New York*, 115 F.Supp. 944, 951 (W.D.Ark.1953), *aff'd*, 213 F.2d 743 (8th Cir.), *cert. denied*, 348 U.S. 862, 75 S.Ct. 85, 99 L.Ed. 679 (1954); *Hardware Mut. Cas. Co. v. Mason–Moore–Tracy, Inc.*, 194 F.2d 173, 175–76 (2d Cir.1952). The exclusion does not require exclusivity of use. *Caisson Corporation v. Home Indemnity Corporation*, 151 Ill.App.3d 130, 104 Ill.Dec. 508, 511, 502 N.E.2d 1168, 1171 (1986). As commonly understood, a dock is a structure along which vessels lie, and upon which cargo is unloaded and equipment necessary thereto is situated. At the time of the fire, Paktank was using Gold Bond's dock to construct improvements and install equipment necessary to its marine terminal operations. This is a purpose for which a dock is ordinarily intended. The fact that none of Paktank's employees were present when the fire started [7] does not alter the fact that Paktank *continuously* used Gold Bond's dock as an essential and integral component of the improvements and equipment. *See Sanco Company v. Employer's Mutual Liability Insurance Co. of Wisconsin*, 102 N.H. 253, 154 A.2d 454, 455 (1959). At the time of the fire, Paktank "used" Gold Bond's dock within the meaning of exclusion "H(2)". Accordingly, the

Arkwright–Boston policy does not cover Paktank for the loss of Gold Bond's dock.

Of course, exclusion H(2) does not apply to any property of Gold Bond which Paktank did not use. The license agreement between Paktank and Gold Bond specifically denied Paktank the right to use Gold Bond's hopper and conveyor system. There is no evidence that Paktank used the hopper or conveyor system. Therefore, the Arkwright–Boston policy provides liability coverage for the loss of Gold Bond's hopper and conveyor system.

In order for Underwriters to recover indemnity from Arkwright–Boston for any sums paid in settlement for Gold Bond's hopper and conveyor system, Underwriters must show that it is entitled to subrogation to the rights of Paktank.[8]

> Legal subrogation is a creature of equity not depending upon contract, but upon the equities of the parties.... [I]t is broad enough to include every instance in which one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter.... [It] is not an absolute right which a party paying the debt of another may enforce at will, but rather, a matter of grace to be granted or withheld as the equities of the case may demand.

*Compania Anonima Venezolana de Navegacion v. A.J. Perez Export Company*, 303 F.2d 692, 697 (5th Cir.1962) (quoting 50 Am.Jur.Subrogation § 3 at 679, § 7 at 686 and § 16 at 693).

■ As discussed above, the Underwriters policy did not provide coverage for Gold Bond's property loss. Indeed, this is Un-

---

7. The uncontradicted evidence establishes that at the time of the fire, there were no Paktank or I.C.M. personnel on the dock. The fire started at approximately 7:00 p.m. How the fire started was never established due to the fact that the suit between Gold Bond and Paktank was settled prior to completion of the trial.

8. Defendants cite *State Farm Fire & Casualty Company v. Sentry Indemnity Company*, 316 So. 2d 185 (La.App. 3d Cir.1975) and *Wiley v. Offshore Painting Contractors, Inc.*, 716 F.2d 256

(5th Cir.1983), for the proposition that "a property damage insurer, ... who has made a payment on behalf of its insured, may not recover from the liability insurer of the same insured, because an insurer may not subrogate against its own insured." Defendants misconstrue these two cases which hold that an insurer may not seek indemnity from *its own insured*. That fact does not prevent an insurer from being subrogated to its insured's rights to seek indemnity from *another insurer* of the same insured.

derwriters' position in the present suit. However, there is no evidence that Underwriters formally denied coverage at any time during the Gold Bond suit. Underwriters defended Paktank and paid all expenses without any reservation of rights for almost two years. When Underwriters was named a direct defendant on the eve of trial, it retained separate trial counsel, James Hanemann, who reviewed the policy and concluded that coverage did not exist. In his deposition, Hanemann suggests that until he was brought into the case, no one acting on behalf of Underwriters had reviewed the policy. He considered contesting coverage, but believed that the trial judge would estop Underwriters from doing so because it had failed to raise the issue timely.[9] Then, on the eve of settlement during trial Underwriters made an untimely and unsuccessful request for contribution from Arkwright–Boston, a nonparty.

Underwriters argues that even though it was under no legal obligation to pay sums in settlement, it is not a mere volunteer precluded from subrogation because it made payment under a mistaken but good faith belief that it was liable, citing *Ohio Casualty Group of Insurance Companies v. Royal–Globe Insurance Companies*, 413 N.E.2d 678 (Ind.Ct.App.1980). The evidence shows that Paktank faced a large, adverse judgment as a solidary obligor with I.C.M., who was underinsured. Arguably, Underwriters was potentially liable; but this was due to the fact that it failed to contest coverage and might have been estopped from doing so during the trial. Any liability Underwriters might have incurred upon a jury verdict against Paktank would stem, not from any legal obligation, but from its own unexcused dilatoriness. In addition, Underwriters, through Mr. Hanemann, had reason to believe that its policy did not provide coverage. Thus, it cannot be said that Underwriters' payment of $400,000 in settlement of the Gold Bond

suit was under a mistaken or good faith belief that it was obligated to pay. Underwriters was acting as a mere volunteer when it paid the settlement funds. Under the circumstances of this case, the equities demand that Underwriters be denied subrogation.

### Defendants' Cross–Claim Against Marsh & McLennan

Defendants' cross-claim against Marsh & McLennan seeking indemnification in the event that liability is imposed on defendants by reason of any binders issued by Marsh & McLennan is moot, no such liability having been imposed. The Court notes that Underwriters did not offer any argument that the Arkwright–Boston policy affords coverage by reason of any binders, nor is there any evidence that would support such an argument.

In view of the foregoing,

IT IS ORDERED that judgment be entered in favor of defendants, Arkwright–Boston Manufacturers Mutual Insurance Company and Mutual Marine Office, Inc., and against plaintiffs, Paktank Louisiana, Inc. and Underwriters at Lloyds and British companies subscribing to Bland, Payne Cover Note No. 4700791, dismissing plaintiffs' suit with prejudice at plaintiffs' costs.

IT IS FURTHER ORDERED that judgment be entered in favor of defendants-in-cross-claim, Marsh & McLennan, Inc., Marsh & McLennan, Inc. of Delaware, and Marsh & McLennan, Inc. of Texas, and against plaintiffs-in-cross-claim, Arkwright–Boston Manufacturers Mutual Insurance Company and Mutual Marine Office, Inc., dismissing the cross-claim with prejudice and costs against plaintiffs-in-cross-claim.

**9.** In *Pakhoed U.S.A., Inc. v. The Underwriters at Lloyds*, No. 81–18907 (Harris County, Texas, April 16, 1986), Paktank alleged that Underwriters coerced Paktank into settlement of the Gold Bond suit by threatening to deny coverage. Underwriters settled the Texas suit, paying Paktank $175,000. Determination of whether Paktank was coerced is not necessary to resolution of the present litigation.